ATTORNEY GENERAL *v.* DETROIT UNITED RAILWAY.[1]

1. CONSTITUTIONAL LAW—STATUTES—CONSTRUCTION.

   Courts should always strive to so construe a statute as to sustain its validity; every intendment favorable to a conclusion sustaining the law must be indulged in.

2. STATUTES—CONSTITUTIONAL LAW—DISCRIMINATORY AND SPECIAL LEGISLATION.

   If the fourth proviso of section 2, Act No. 382, Pub. Acts 1919, must be so construed as to bar defendant from its benefits, rendering it discriminatory and special legislation in violation of the Constitution, *held*, that the whole act must fail.

3. SAME—CONSTRUCTION.

   *Held*, that said act was intended to affect all railroads within the State except those distinctly placed outside its operation by the first three provisos of section 2.

[1]Removed to United States Supreme Court on writ of error June 18, 1920.

On power of legislature to delegate to commission the right to fix rates to be charged by public service corporations, see note in 18 L. R. A. (N. S.) 713.

On legislative power to fix tolls, rates and prices, see note in 33 L. R. A. 177.

4. SAME—CARRIERS—RAILROADS—RATES.

In construing Act No. 382, Pub. Acts 1919, providing relief for railroads operating under franchises entered into previous to the world war, by allowing an increase in passenger rates, in view of the positive language of the title of the act and the opening words of section 2, including within its provisions all railroads, including defendant, the inconclusive language of the fourth proviso of section 2, excluding from its beneficial effects those railroads whose gross earnings in 1918 equaled or exceeded $8,000 per mile of road operated, *held*, not controlling. FELLOWS and BIRD, JJ., dissenting.

5. SAME.

The fourth proviso of section 2 of said act construed, and *held*, to express the legislative intent to exclude all railroads earning more than $8,000 per mile from the 2½-cent rate provided in section 1. FELLOWS and BIRD, JJ., dissenting.

6. SAME.

The 5th proviso of section 2 of said act construed, and *held*, to require all railroads now or hereafter earning $10,000 per mile to charge not to exceed two cents per mile, although the language of the act apparently limited its application to those railroads which in the future should earn $10,000 per mile. FELLOWS and BIRD, JJ., dissenting.

7. SAME.

Construing all the provisos of section 2 of said act so as to give validity thereto, it is *held*, that defendant railroad, although earning in excess of $10,000 per mile at the time said statute was enacted, is within the provisions of said act, and entitled, under the 5th proviso, to the 2-cent rate provided therein. FELLOWS and BIRD, JJ., dissenting.

8. CONSTITUTIONAL LAW — RATE-FIXING POWER — RESERVATION OF POWER BY STATE — POWER OF STATE TO INCREASE FRANCHISE RATES.

The contention that Act No. 382, Pub. Acts 1919, is unconstitutional because thereby the legislature attempted to increase railroad rates provided in township and village franchises without the consent of those municipalities cannot be sustained, since the legislature cannot, by a

grant of power to the several municipalities of the State, divest itself of the right to reassume and itself exercise such powers as are granted it in that behalf under the Constitution, among which is the power to fix reasonable rates for public utilities.

9. SAME—OBJECT OF ACT EXPRESSED IN TITLE.
   Nor is said act unconstitutional because its object is not sufficiently expressed in its title.

10. SAME—IMPAIRMENT OF CONTRACTS — STATUTES — INCREASE OF FRANCHISE RATES—STATE LEGISLATURE—POWERS.
   Although the legislature had delegated to municipalities the power to contract with railroads in regard to passenger rates, in enacting a law increasing said rates without the consent of the municipalities, *held*, that the legislature did nothing more than to exercise an undoubted power of legislation which it had never contracted not to exercise, and, in so doing, that it did not enact a law which impaired contract obligations. FELLOWS and BIRD, JJ., dissenting.

Appeal from Ingham; Wiest (Howard), J. Submitted October 22, 1919. (Docket No. 121.) Decided April 10, 1920. Rehearing denied April 28, 1920.

Bill by Alex. J. Groesbeck, attorney general, against the Detroit United Railway to enjoin the collection of illegal rates. From a decree for plaintiff, defendant appeals. Reversed.

*Alex. J. Groesbeck,* Attorney General, *Sheridan F. Master,* and *Thomas G. Baillie,* Assistants Attorney General (*Leland W. Carr,* of counsel), for plaintiff.

*Hinton E. Spalding* and *William L. Carpenter* (*Bernard F. Weadock, P. J. M. Hally, Edward Donnelly* and *William M. Donnelly,* of counsel), for defendant.

*Frank E. Robson, amicus curiæ.*

FELLOWS, J. (*dissenting*). The question involved in this litigation is to be determined by the consti-

tutionality and the proper construction of Act No. 382 of the Public Acts of 1919. The act is set up in full in the margin hereof.[1] The decree appealed from enjoined the defendant from collecting from its passengers the rate of fare specified in said act and compels it to charge only at franchise rates. In order to properly understand the claims of the counsel with reference to the question involved, it becomes necessary to go somewhat into the legislative history of the act in question. Such a history is set forth in the brief of counsel for the State, where the following is stated:

"On March 17, 1919, Senator Smith introduced a bill which was given senate number 251, the title of which was as follows:

"'A bill to amend section 9 of article II of Act No. 198 of the Session Laws of 1873, entitled "An act to revise the laws providing for the incorporation of the railroad, bridge and tunnel companies, and to'regulate the running and management and to fix the duties and liabilities of all railroad, bridge, tunnel and other corporations owning or operating any railroad, bridge, or tunnel within this State," being section 8243 of the Compiled Laws of 1915.'

"The amendment proposed was to subdivision 9 of section 9 of article II of the general railroad law above referred to, and changed the rates of fare provided for in the old law so as to allow all railroads operating within the State to charge three cents per mile for the transportation of passengers.

"For the convenience of the court we quote the amendment included in Senator Smith's bill:

_____

[1]AN act to fix the rate of fare for transportation of passengers within this State, which may be charged by any railroad company, including steam, electric. suburban and interurban railways.

*The People of the State of Michigan enact:*

SECTION 1. It shall hereafter be lawful for any railroad company to charge for transporting within this State any passenger and his or her ordinary baggage, not exceeding in weight one hundred fifty pounds, not exceeding the following rate of fare,

" '*Ninth.* To regulate the time and manner in which passengers and property shall be transported, and the tolls and compensation to be paid therefor; but such compensation for transporting any passenger and his or her ordinary baggage, not exceeding in weight one hundred fifty pounds, shall not exceed * * * three cents per mile * * *: *Provided:* * * * That no company shall charge, demand or receive any greater compensation per mile for transportation of children of the age of twelve years or under than one-half the rate herein prescribed: *Provided further*, That any railroad company may charge a minimum fare of five cents for each passenger transported over its road, whenever cars are propelled or moved by motor power other than steam: *Provided further*, That any railroad company which shall, within thirty days after notification by the railroad commission, fail to comply with the provisions of subdivision nine of this section, shall immediately after such failure become liable to the people of the State of Michigan in a penalty of five hundred dollars per day for each and every secular day during the pendency of such failure, which said penalty shall be collected in an action to be brought by the railroad commission in any court of competent jurisdiction within this State, and which said penalty, when collected, shall be paid into the State treasury and credited to the primary school fund. The penalty in this section mentioned shall be supplemental to and shall not be deemed to supersede any extraordinary remedy by mandamus or otherwise authorized by law to be instituted by the State, the railroad commission or any State officer or board to compel compliance with section one of this act. The provisions of this section shall apply to all railroad companies operating lines of railroad in this State, whether such companies are organized under the general railroad law or under any special charter from the State legislature.'

"After introduction the bill was read a first and second time, ordered printed and referred to the committee on railroads. (Senate Journal 579.)

namely: A minimum fare of five cents; for a distance not exceeding five miles, three cents per mile; for all other distances, two and one-half cents per mile: *Provided*, That any railroad company may charge or receive for transportation of children of the age of twelve years and over the age of five years a minimum fare of five cents; for a distance of not exceeding five miles, not more than one and one-half cents per mile; for all other distances, not more than one and one-fourth cents

"On March 25, 1919, the committee on railroads reported the bill without amendment and recommended its passage. (Senate Journal 763.)

"On March 26, 1919, the bill was considered in the committee of the whole and was reported to the senate without amendment and its passage recommended. (Senate Journal 792.)

"On April 1st, 1919, the bill was placed on third reading and prior to a vote being taken the following amendments were offered:

"(a) 'Provided, however, That the provisions of this section shall not apply to any electric railroad operating within this State'—which amendment was seconded and adopted.

"(b) The bill was amended by substituting a rate of two and one-half cents per mile in place of three cents as originally proposed.

"(c) An amendment providing for the payment of the cost of pavement or planking between tracks in any municipality by the railroad company affected.

"(d) An amendment prohibiting any railroad company from charging any fare in excess of the rate of fare allowed in interstate commerce.

"These amendments were adopted and the bill, as thus amended, passed. (Senate Journal 881-882.)

"On April 2d the senate reconsidered the vote by which it had passed the bill. (Senate Journal 936.)

"An attempt was made to again amend it by inserting a provision for a three-cent fare in place of the two and one-half cent fare thus provided for. Pending a vote upon this amendment the bill was made a special order for April 3d at four o'clock, p. m. (Senate Journal 936.)

---

per mile: *Provided*, That children of the age of five years or under shall be transported free of charge: *Provided*, That steam railroads whose gross passenger earnings for the entire system do not exceed four hundred dollars per mile per year may charge not to exceed four cents per mile.

SEC. 2. This act shall apply to all railroads, including the so-called steam railroads, electric railroads, suburban railroads and interurban railroads: *Provided*, That this act shall not apply to the rates of street or interurban railroads charged in the transportation of passengers within the limits of cities, or within a distance of five miles of the boundaries thereof: *Pro-*

"On April 3d, the day upon which the bill had been set for a special order, certain other amendments were made to the bill.

"(*a*)  Mr. Brennan moved to amend the bill by striking out the words 'two and one-half cents per mile' and inserting in lieu thereof the following language:

"'the following prices, viz.:  For a distance not exceeding five miles, three cents per mile; for all other distances for all companies the gross earnings of whose passenger trains, as reported to the commissioner of railroads for the year nineteen hundred six equaled or exceeded the sum of one thousand two hundred dollars per mile for each mile of road operated by said company, on which regular passenger service is maintained, as hereinafter provided, two and one-half cents per mile, and for all companies whose earnings reported as aforesaid were less than one thousand two hundred dollars per mile of road operated by said company, three cents per mile: *Provided*, That in the future, whenever the earnings of any company doing business in this State, as reported to the railroad commission at the close of any year, shall increase so as to equal or exceed the sum of one thousand two hundred dollars per mile of road operated by said company, then in such case said company shall thereafter, upon the notification of the railroad commission, be required to only receive as compensation for the transportation of any passenger, his or her ordinary baggage, not exceeding in weight one hundred fifty pounds, a rate of only two and one-half cents per mile as hereinbefore provided: *Provided further*, That in computing the passenger earnings per mile of any company the earnings and mileage 'of all branch roads owned, controlled or occupied or that may hereafter be owned, leased, controlled or occupied by such company, exclusive of

---

*vided further*, That this act shall not apply to any railroad, the control of which has been taken over by the Federal Government, while under such Federal control: *Provided further*, That this act shall not be construed to limit the right of any railroad which under the provisions of subdivision nine of section eight thousand two hundred forty-three of the Compiled Laws of nineteen hundred fifteen, is authorized to charge a rate of fare of three cents per mile: *Provided further*, That these rates shall not apply to electric, suburban or interurban railroads whose gross passenger earnings, as reported to the railroad commission for the year nineteen hundred eighteen, equaled or exceeded eight thousand dollars per mile for each mile of road operated by said company, including all branch

all spurs and branches over which such company does not operate each way daily, except Sunday, at least one passenger train, or mixed train having at least two passenger coaches or one passenger coach and baggage car, shall be included in the computation, and the rate of fare shall be the same on all lines owned, leased, controlled or occupied by such company.'

"(b) A further amendment simply provided for an insertion of certain words made necessary by the additional amendment which have no bearing upon the issue. (Senate Journal 982-983.)

"The bill was laid over for one day under the rules, and on April 4th the bill was passed and transmitted to the house. (Senate Journal 994.)

"On April 8th the bill was received in the house, read for the first and second times, and referred to the committee on railroads. (House Journal 1246.)

"On April 11th the committee on railroads in the house reported senate bill 251 with a substitute therefor, entitled:

"'A bill to fix the rate of fare for transportation of passengers within this State which may be charged by any railroad company, including steam, electric suburban and interurban railways,'

—and recommended that the substitute be concurred in and passed. The substitute was adopted, ordered printed and referred to the committee of the whole. The substitute bill, as reported by the committee, was in the following form:

roads owned, leased, controlled or occupied by such company: And *Provided*, That in the future whenever the passenger earnings of any electric, suburban or interurban railroad, as reported to the railroad commission, at the close of any year, shall increase so as to equal or exceed the sum of ten thousand dollars per mile per annum for each mile of road so operated by such company, then in such case said company shall thereafter, upon the notification of the railroad commission, be required to charge not exceeding two cents per mile for the transportation of any passenger and his or her ordinary baggage as above provided.

SEC. 3. Any railroad company which shall, within thirty days after notification by the railroad commission, fail to comply with the provisions of this act, shall immediately after such failure become liable to the people of the State of Michigan in

" 'A bill to fix the rate of fare for transportation of passengers within this State which may be charged by any railroad company, including steam, electric, suburban and interurban railways.

" '*The People of the State of Michigan enact:*

" 'SECTION 1. It shall hereafter be lawful for any railroad company to charge for transporting within this State any passenger and his or her baggage, not exceeding in weight one hundred fifty pounds, not exceeding the following rate of fare, namely:

" 'A minimum fare of five cents for a distance of not exceeding five miles, three cents per mile; for all other distances, two and one-half cents per mile: *Provided*, That any railroad company may charge or receive for transportation of children of the age of twelve years or under a minimum fare of five cents; 'for a distance of not exceeding five miles, one and one-half cents per mile; for all other distances one and one-fourth cents per mile.

" 'SECTION 2. This act shall apply to all railroads, including the so-called steam railroads, electric railroads, suburban railroads and interurban railroads: *Provided*, That this act shall not apply to street railroads engaged solely in the transportation of passengers within the limits of cities, or within a distance of five miles of the boundaries thereof: *Provided further*, That this act shall not apply to any railroads, the control of which has been taken over by the Federal government, while under such Federal control: *Provided further*, That this act shall not be construed to limit the right of any railroad which, under the provisions of subdivision nine of section 8243 of the Compiled

a penalty of five hundred dollars per day for each and every secular day during the pendency of such failure, which said penalty shall be collected in an action to be brought by the railroad commission in any court of competent jurisdiction within this State, and which said penalty when collected shall be paid into the State treasury and credited to the primary school fund.   The penalty in this section mentioned shall be supplemental to and shall not be deemed to supersede any extraordinary remedy by mandamus or otherwise authorized by law to be instituted by the State, the railroad commission or any State officer or board to compel compliance with section one of this act.

SEC. 4. All acts or parts of acts, general, local or special, of this State and all rules, orders and regulations of the railroad commission or any other State agency contravening the provisions of this act are hereby repealed.

Approved May 13, 1919.

Laws of 1915, is authorized to charge a rate of fare of three cents per mile.

"'SECTION 3. Any railroad company which shall within thirty days after notification by the railroad commission, fail to comply with the provisions of this act shall immediately after such failure become liable to the people of the State of Michigan in a penalty of five hundred dollars per day for each and every secular day during the pendency of such failure, which said penalty shall be collected in an action to be brought by the railroad commission in any court of competent jurisdiction within this State, and which said penalty when collected, shall be paid into the State treasury and credited to the primary school fund. The penalty in this section mentioned shall be supplemental to and shall not be deemed to supersede any extraordinary remedy by mandamus or otherwise authorized by the law to be instituted by the State, the railroad commission or any State officer or board to compel compliance with section one of this act.

"'SECTION 4. All acts or parts of acts general, local, or special of this State, or the railroad commission, or any other State agency contravening the provisions of this act are hereby repealed.'

"On April 16th the committee of the whole in the house reported progress and asked for further time to consider the bill. (House Journal 1525.)

"On April 17th the committee of the whole in the house had under consideration the substitute bill and made certain amendments to the same, the principal of which was the insertion of the proviso which is under discussion in this litigation. The amendment was as follows:

"'Amend by inserting in line 12 of section 2, after the word "mile," the words *"Provided further,* That these rates shall not apply to electric, suburban or interurban railroads whose gross passenger earnings, as reported to the railroad commission for the year nineteen hundred eighteen, equaled or exceeded eight thousand dollars per mile for each mile of road operated by said company, including all branch roads, owned, leased, controlled or occupied by such company, and *Provided:* That in the future whenever the passenger earnings of any electric, suburban or interurban railroad, as reported to the railroad commission at the close of any year, shall increase so as to equal or exceed the sum of ten thousand dollars per mile for each mile of road so operated by such company, then in such case

said company shall thereafter, upon the notification of the railroad commission, be required to charge not exceeding two cents per mile for the transportation of any passenger and his or her ordinary baggage as above provided." (House Journal 1598.)'

"The other amendments made by the committee of the whole were the insertion of words made necessary by the adoption of the above provisos. (House Journal 1598.)

"On April 18th the house passed the substitute bill as amended by the committee of the whole. (House Journal 1619-20.)

"This bill was passed after considerable debate, in which the point of order was raised that the substitute bill had a different purpose than the original bill, and, therefore, was not properly before the house for consideration. This point of order, however, was overruled by the chair and the chair was sustained. Certain other minor amendments were also made to the bill prior to passage, the word 'passenger' being inserted after the word 'gross' in section 1; the words 'per annum' were inserted after the word 'mile' in the proviso of section 2, and a further amendment made that children of the age of five years or under should be transported free of charge. After these amendments the bill was passed. (House Journal 1621.)

"On April 19th the substitute bill, as amended, was returned to the senate and the same made a special order for April 22d at three o'clock, p. m. (Senate Journal 1405.)

"Upon that day it was again made a special order for the 24th. (Senate Journal 1489.)

"On April 23d, however, the rules were suspended and the bill was taken up for immediate consideration. (Senate Journal 1500.)

"While the bill was under consideration certain minor amendments were adopted, and an effort was also made to amend by striking out the word 'eight' and inserting the word 'six' (these words having application to the earnings per mile) but this amendment was lost. A further attempt was made to strike out the word 'electric' wherever it appeared in the bill and this was lost. The bill was then concurred in and passed. (Senate Journal 1502.)

"On April 24th the house concurred in the amendments made by the senate. (House Journal 1781.)

"On April 24th the bill was returned to the senate and referred to the secretary for enrollment. (Senate Journal 1574.)

"On August 4, 1919, there were filed with the Michigan public utilities commission certain passenger tariffs by the defendant and its constituent companies, effective August 14, 1919 (the date upon which the act took effect), raising the fare upon all their interurban lines to two cents per mile. There were some few instances where the rate was slightly above and others where it was slightly below two cents per mile. The franchise rates previously in force were uniformly ignored."

The position of the attorney general with reference to the claims made in the bill of complaint is thus stated by him:

"*First.* Its gross passenger earnings per mile of road operated, for the year 1918, were in excess of eight thousand dollars.

"*Second.* Act No. 382 of the Public Acts of 1919 was unconstitutional and void for the reasons:

"(*a*) Its object was not set forth in the title.

"(*b*) The standard fixed for the determination of rates was arbitrary and discriminatory as between railroads of the same class.

"(*c*) It discriminated between passengers traveling on different parts of defendant's system.

"(*d*) It attempted to supersede and nullify all franchises and contracts, fixing rates of fare, which had been entered into between the municipalities and the defendant and its predecessors."

The learned trial judge, after a full hearing, held that the gross passenger earnings of the defendant and its subsidiary companies for the year 1918 exceeded the sum of $8,000 per mile of first main track and consequently that the defendant and the other lines operated and controlled by it were excluded from the provisions of the act under proviso 4, section 2,

thereof. The act was held to be a constitutional and valid enactment and not discriminatory as against the defendant. The court also found that by virtue of the ownership of the stock of the Detroit, Monroe & Toledo Short Line Railway, the Detroit, Jackson & Chicago Railway, and the Rapid Railway system, which is held in trust by the president of the Detroit United Railway for said company, that said companies were a part of the Detroit United Railway system and must be included in said system. By reason of the finding that the Detroit United Railway was excluded from taking advantage of the provisions of the act by reason of proviso 4 thereof, the court enjoined the defendant from charging the rates of fare set forth in the tariff filed on August 4th, and made effective August 14, 1919.

The conclusion herein arrived at makes it unnecessary for us to enter into a discussion of some of the points urged by counsel for the State, as above set forth. The first and most essential question for consideration is interpretation of the act itself. In the consideration of the troublesome provisos, to wit, provisos 4 and 5, we will start with the presumption that, if possible, an act of the legislature should be construed as fair and constitutional if the language can be given such an interpretation. The trial judge, in discussing this phase of the question, said the following:

"I have endeavored, through the use of every permissible rule of interpretation and construction to bring the defendant within the rate provisions of the act only to be met with insuperable objection.

"To bring defendant within the rate provisions of the act it would be necessary to read words out of the act or to recast the same so as to avoid the obvious meaning of the words used.

"There is no ambiguity in the language of the act and considering the context no reason for departing from its plain provisions.

"The gross passenger earnings of defendant's rail-

way system places it outside of the provisions of the act."

With reference to this conclusion, counsel for the defendant say that the learned trial judge "looked at the words without considering the purposes of this part of the act and the legislative judgment upon which it was based." After a careful consideration of the claims of counsel with reference to the interpretation that should be given these provisos, it is our conclusion that a study of the language of the act is clearly convincing that it was the legislative intent, as expressed by this language (and in this regard the language is not uncertain or ambiguous), that any road whose passenger earnings, as reported to the railroad commission for the year 1918, equaled or exceeded $8,000 per mile of track operated by such road, should be for all time excluded from the benefits of the law. The words of the fifth proviso:

"That in the future whenever the passenger earnings of any electric, suburban or interurban railroad, as reported to the railroad commission at the close of any year, shall increase so as to equal or exceed the sum of ten thousand dollars per mile per annum for each mile of road so operated by such company,"

—giving due weight to the words of futurity therein clearly stated, refer to those roads which in 1918 were earning less than $8,000 per mile and which roads, by virtue of the provisions of the act, were allowed to charge two and one-half cents per mile and thereby increase their earnings until such time as they earned $10,000 per mile, when they were to be allowed to charge only the two-cent rate mentioned in the act.

A careful study of the act seems to warrant the conclusion that the apparent object of this law was to assist electric railways with earnings of less than $8,000 per mile in 1918 and exclude those that had greater earnings. It is the contention of the defend-

ant that it comes within the 5th proviso because it is conceded that its earnings in the year 1918 exceeded the sum of $10,000 per mile.  We do not think that the language of the act is susceptible of any such construction, and, moreover, giving it such a construction would lead to a most unusual and anomalous situation.  A road earning in excess of $10,000 per mile would be entitled to charge two cents per mile, while a road that was earning less than $10,000 per mile and in excess of $8,000 per mile would be left to its franchise rates.  Our conclusion is (and in this we agree with the opinion of the learned trial judge) that the gross passenger earnings of the defendant railway system place it outside of the provisions of the act.

Can the act be held unconstitutional because of the elimination of the defendant from the benefits thereby attempted to be given?  The trial judge was of the opinion that the exclusion of the defendant from the act did not invalidate the act, which conclusion he based upon the broad proposition that, under our Constitution, the legislature may fix different passenger rates for different railways and might classify such railroads for the purpose of such rate regulation.

With the broad statement of the rule with reference to classification under this statute, we take no exception.  But can it not be said that the 4th proviso of section 2 is in direct violation of section 30 of article 5 of the Constitution?  This section is as follows:

"The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question.  No local or special act shall take effect until approved by a majority of the electors voting thereon in the district to be affected."

With reference to this contention, the following is found in the answer of the defendant, in commenting

210—Mich.—16.

upon the question of whether or not the 4th proviso of section 2 is constitutional:

"This proviso was inserted for the purpose of excluding the defendant, and the defendant only, from the operation of said act. It was intended that said proviso should be so construed as forever to exclude from the operation of the act a corporation or individual operating electric interurban railroads when and only when the gross passenger earnings from all such railroads operated by it as shown by its report filed for the year 1918 equalled or exceeded the sum of eight thousand ($8,000) dollars per mile. Defendant is the only corporation or individual within the State of Michigan or elsewhere which comes within this class, and this fact was well known to the legislature when this proviso was inserted, and it was inserted for the purpose, and the sole purpose, of excluding the defendant from the benefits of the act. If so construed, the proviso is unconstitutional for each of the following reasons:

"1. It is a denial to this defendant of the equal protection of the laws in contravention of the 14th amendment of the Constitution of the United States.

"2. It is an unconstitutional discrimination against defendant within the principles recognized and applied by the Supreme Court of Michigan in the case of *Chaddock* v. *Day*, 75 Mich. 527 (4 L. R. A. 809, 13 Am. St. Rep. 468), and in the more recent case of *People, ex rel. Attorney General*, v. *Sperry & Hutchinson Co.*, 197 Mich. 532 (L. R. A. 1918A, 797).

"3. It is legislation prohibited by section 30, article 5 of the Constitution of the State of Michigan. * * *

"Defendant further says that said proviso can be given no construction which would bring defendant within its terms which does not make it unconstitutional for the foregoing reasons.

"Further answering said paragraph 10, this defendant alleges the fact to be that said proviso is unconstitutional, null, void and inoperative for the reasons hereinbefore stated but that the illegal proviso does not invalidate the whole act but on the other hand, that said Act No. 382, Public Acts of 1919, is valid, except as to the fourth proviso of section 2 of said act and that the doings of this defendant as here-

in set forth are valid and binding on this defendant, the plaintiff and the people of the State of Michigan."

In view of the fact that we are forced from a study of the legislative history of the act as above set forth to the conclusion that the legislature might just as well have said in proviso 4 that this act shall not apply to the Detroit United Railway as to have used the language that it did use, we see no escape from holding that we have before us a discriminatory and special piece of legislation of the most flagrant character. It appears from the answer of the defendant that it is the sole member of the class which is forever eliminated from the benefits of the act. It can never hope to avail itself of the advantages of the statute. Other railroads which may in the future get into the class in which the Detroit United Railway now is would have advantages which are forever denied to the defendant and thus members of the same class, similarly situated, would not be treated alike under the provisions of this act. See *Stimson* v. *Booming Co.,* 100 Mich. 347.

We agree with contentions of counsel that proviso 4, given the construction that must be given to it under its language, is such special and discriminatory legislation as to offend the constitutional provision above set forth, it clearly appearing that a general law could have been made applicable to the subject-matter of the act in question. The legislative history is also convincing that the act in question would not have passed with proviso 4 eliminated, and the belief is clearly warranted that the legislature intended all of the provisions of the act to stand together and that if all of the provisions could not have been carried into effect, the legislature would not have passed the residue independently. This being true, the whole act must fall with the unconstitutional provision in question. See Cooley's Constitutional Limitations (6th

Ed.), p. 211; *State Board of Agriculture* v. *Auditor General,* 180 Mich. 349.

While all doubts should be resolved in favor of the constitutionality of the solemn act of the legislature, the case before us is so clearly a violation of the spirit and provision of the Constitution as to special and class legislation that we are constrained to hold that the whole act must fail.

In my judgment a decree should be entered in accordance with this opinion, with costs to the appellee.

A majority of my Brethren do not agree with these views, but are in accord with those expressed by Mr. Justice BROOKE on this subject. They also agree with him in the disposition of the question of the binding force of the contracts entered into by the various municipalities with defendant's predecessors and subscribe to the following language of his opinion:

"I think it is clear from the authorities that the legislature cannot by a grant of power to the several municipalities of the State, divest itself of the right to reassume and itself exercise such powers as are granted it in that behalf under the Constitution, among which is this power to fix reasonable rates."

With this broad statement and its application here as holding that the contracts made by the various municipalities with defendant's assignors have no longer binding force since Act No. 382, Public Acts 1919, became effective, I do not agree. Under the Constitution I am required to state the reasons for my dissent. This I will do as briefly as possible.

I shall reverse the usual order by first stating my conclusions which are:

(*a*) There is a distinction between the power delegated to a municipality to fix a rate by legislative enactment and the power delegated to it to make a rate by contract. Either or both powers may be conferred in the absence of constitutional restriction, but the delegation of either power must be in express terms.

(*b*) The power delegated to a municipality to fix a legislative rate is subject to the right of the State to reassume such power, and upon the retaking of that power and its exercise by the State the legislative rate so fixed under such delegated power is at an end and must fall before the superior power of the State.

(*c*) The power delegated to a municipality to enter into a contract fixing a rate is the power to make a valid contract, a contract binding both the public and the utility, and enforceable by both alike, such a contract as is protected by both the Federal and the State Constitutions, and its nullification. or impairment by the State is prohibited by section 10, article 1, of the Federal Constitution.

In *City of Kalamazoo* v. *Kalamazoo Circuit Judge,* 200 Mich. 146, this court fully considered the distinction between the power to make a legislative rate and the power to contract for a rate. The power to contract may exist although the power to legislate does not, as we there held. In my judgment the infirmity in the majority opinion, as well as in some of the cases cited to support it, lies in the fact that this distinction is not recognized. I shall first consider the cases cited in the majority opinion. *City of Worcester* v. *Railway Co.,* 196 U. S. 539 (25 Sup. Ct. Rep. 327), by its reasoning supports the language above quoted from the majority opinion. It is not, however, a rate case, does not take note of the distinction which would arise between a legislative rate and a contract rate, and in my judgment is out of accord with the great weight of authority in that court if it be construed as holding all that is claimed for it. *Kies* v. *Lowrey,* 199 U. S. 233 (26 Sup. Ct. Rep. 27), involved the power of the legislature of this State to consolidate certain school districts. It affirmed *Attorney General* v. *Lowrey,* 131 Mich. 639. I do not perceive its applicability here. In the case of *People, ex rel. Village of South Glens Falls,* v. *Public Service Com'n,* 225 N.

Y. 216 (121 N. E. 777), three opinions were written. The opinion of Justice Crane undoubtedly is sustaining of the language under consideration. Four justices concur in his disposition of the case, but two of them, Chief Justice Hiscock and Justice McLaughlin, in an opinion prepared by Justice McLaughlin, concur in the result on the ground that the power to fix rates at which gas should be sold to consumers in the village of South Glens Falls had not been expressly conferred. Justices Chase and Collins dissent in an opinion prepared by Justice Chase, and Justice Hogan dissents generally. Under these circumstances this case is not very persuasive. The case of *State, ex rel. Garner*, v. *Telephone Co.*, 189 Mo. 83 (88 S. W. 41), turned on the question of whether the power had been delegated and it was held that it had not been. The case is not unlike that of *City of Kalamazoo* v. *Titus*, 208 Mich. 252. In *State, ex rel. City of Sedalia*, v. *Public Service Com'n*, 275 Mo. 201 (204 S. W. 497), the same court considered the provision of the constitution of that State that "the exercise of the police power of the State shall never be abridged," and held that the delegation of the power to a municipal corporation to contract for water rates was an abridgement and therefore invalid under the constitution. This case considered the peculiar language of the Missouri constitution and is in conflict with the uniform holdings of this court that cities and villages may contract for a supply of water for fire protection and public use. In *Cleveland Telephone Co.* v. *City of Cleveland*, 98 Ohio St. 358 (121 N. E. 701), the Ohio supreme court had before it the validity of an ordinance fixing a legislative rate by a city which had adopted a home-rule charter. The court had under consideration the home-rule provisions of the constitution and this case likewise is similar to *City of Kalamazoo* v. *Titus, supra*, and the conclusion of the Ohio court did not differ

from the conclusion we reached in the *Titus Case.*
But that court on the same day handed down a *per
curiam* opinion in *State, ex rel. Zielonka,* v. *Marshall,*
98 Ohio St. 467 (121 N. E. 700), in which it issued a
writ of prohibition, prohibiting the utilities commis-
sion of the State from opening up a cause which had
been settled by an agreement between the public ser-
vice corporations and the city of Cincinnati, the court
finding among other things the following:

"And the court further find that, where an order
of the utilities commission has been entered in a cause
pending before it by agreement and in pursuance of
a contract of settlement between the parties to the
controversy pending before such commission, the com-
mission has no power or authority to open up and set
aside such order, and relieve either of the parties to
the contract from the terms and conditions thereof,
during the time covered by the contract of settlement
made by the parties thereto."

Let us now take up some of the cases having under
consideration the precise question here involved, *i. e.,*
where express authority is delegated by the State to
the municipality to contract for a rate and acting un-
der such delegated authority the municipality con-
tracts for a rate of fare over a certain period, may
the State by reassuming such power put an end to
and nullify, as against the municipalities and the pub-
lic, all contracts so made by them. I shall not enter
into a detailed consideration of the facts of each case,
that cannot be done without unnecessarily lengthen-
ing this opinion. What we are seeking is the rule,
and to the rule announced I shall direct my attention.

In *Vicksburg* v. *Waterworks Co.,* 206 U. S. 496 (27
Sup. Ct. Rep. 762), after considering the authorities,
it is said:

"In the light of these decisions, and others might
be cited, we reach the conclusion that, under a broad
grant of power, conferring, without restriction or lim-

itation, upon the city of Vicksburg the right to make a contract for a supply of water, it was within the right of the city council, in the exercise of this power, to make a binding contract, fixing a maximum rate at which water should be supplied to the inhabitants of the city for a limited term of years, and, in the absence of a showing of unreasonableness 'so gross,' as the court of Mississippi has said, 'as to strongly suggest fraud or corruption,' this action of the council is binding, and for the time limited puts the right beyond legislative or municipal alteration to the prejudice of the other contracting party."

In *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 264 (29 Sup. Ct. Rep. 50), it was said:

"It has been settled by this court that the State may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation (or natural person) for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates."

In the very recent case of *Columbus, etc., Power Co.* v. *City of Columbus*, 249 U. S. 399 (39 Sup. Ct. Rep. 349), Mr. Justice Day, speaking for the court, said:

"That a city, acting under State authority, may in matters of proprietary right make binding contracts of the nature contained in these ordinances, is well established by the adjudications of this court."

In *City Railway Co.* v. *Citizens Street R. Co.*, 166 U. S. 557 (17 Sup. Ct. Rep. 653), it was said:

"The original ordinance of January 18, 1864, was plainly a proposition on the part of the city to grant to the company the use of its streets for thirty years, in consideration that the company lay its tracks and operate a railway thereon upon certain conditions prescribed by the ordinance. This proposition, when accepted by the company and the road built and operat-

ed as specified, became a contract which the State was not at liberty to impair during its continuance."

In *Detroit United Ry.* v. *Michigan*, 242 U. S. 238 (37 Sup. Ct. Rep. 87), the Supreme Court of the United States in reversing two of the decisions of this court (*People* v. *Railway*, 162 Mich. 460, and *City of Detroit* v. *Railway*, 173 Mich. 314), and having under consideration the identical statute under which the franchises in the instant case were granted, said:

"Because of the provision of section 10 of article 1 of the Constitution of the United States, it was not within the power of the State of Michigan by any subsequent legislation to impair the obligations of those contracts, and since the judgments of the Supreme Court of that State gave such an effect to the annexation acts of 1905 and 1907, in conjunction with the ordinances of 1889, as to impair those obligations, the judgments must be reversed."

In *Stone* v. *Railroad Co.*, 62 Miss. 607, the Supreme court of that State used the following significant language:

"The power to contract is an essential attribute of sovereignty and is of prime importance. Its exercise has been productive of incalculable benefits to society, however great may be the evils incident to its injudicious employment. It cannot be denied merely because of its liability to abuse. The power to contract implies the power to make a valid contract. * * *
"If anything is or ever can be settled in American constitutional law, the sanctity and inviolability of a contract between a State and individuals in the shape of a charter for a business enterprise, accepted and acted on by the corporators on the faith of its terms and provisions, must be so regarded."

See, also, *Atlantic Coast Electric R. Co.* v. *Public Utility Com'rs*, 89 N. J. Law, 407 (99 Atl. 395) ; *City of Detroit* v. *Railway Co.*, 184 U. S. 368 (22 Sup. Ct. Rep. 410) ; *Columbus, etc., Power Co.* v. *City of Columbus*, 253 Fed. 499, 504; *Hillsdale Gaslight Co.* v.

*City of Hillsdale,* 258 Fed. 485; *City of Lansing* v. *Michigan Power Co.,* 183 Mich. 400; *Lenawee County Gas & Electric Co.* v. *City of Adrian,* 209 Mich. 52.

By Act No. 35, Laws of 1867 (2 Comp. Laws 1915, § 8532 *et seq.*), the legislature has expressly conferred upon municipalities the power to make contracts with street railway companies agreeing upon the rate of fare to be charged within their borders. That this power is the power to agree upon a rate by binding contract as distinguished from the power to fix a legislative rate is settled beyond peradventure. In the case of *Detroit United Ry.* v. *Michigan, supra,* the franchises under consideration had been granted under the authority of this act. Mr. Justice Pitney, speaking for the court, said:

"Coming, then, to the merits: Not only is it not disputed, but it is not open to serious dispute, that the original village and township grants were contractual in their nature. It appears that the recipients of those grants, like their successor, the plaintiff in error, became incorporated under the Street Railway Act of 1867, of which section 13 provides that consent for the construction and maintenance of a street railway is to be given by the corporate authorities in an ordinance to be enacted for the purpose, and under such rules, regulations, and conditions as may be prescribed by such ordinance, but that no such railway shall be constructed until the company shall have accepted in writing the terms and conditions upon which they are permitted to use the streets. By section 14, after any city, village, or township shall thus have consented to the construction and maintenance of street railways, or granted rights and privileges to the company, and such consent and grant shall have been accepted by the company, the consent shall not be revoked or the company deprived of the rights and privileges conferred. And by section 20 the rates of toll or fare to be charged by the company are to be established by agreement between it and the corporate authorities, and are not to be increased without consent of such authorities. It is plain, as was pointed

out by this court in *City of Detroit* v. *Railway Co.,*
184 U. S. 368, 385, that the legislature regarded the
fixing of the rate of fare as a subject for agreement
between the municipality and the company. And in
these cases, as in that, the terms of the several ordi-
nances are such as clearly to import a purpose to con-
tract under the legislative authority thus conferred."

And in the later case of *Puget Sound Traction Co.*
v. *Reynolds,* 244 U. S. 574 (37 Sup. Ct. Rep. 705), it
was said:

"The present case is very clearly distinguishable
from *Detroit United Ry.* v. *Michigan,* 242 U. S. 238,
248, where the State legislature had expressly pro-
vided that the municipal corporation might make a
binding agreement with a street railway respecting
the rates of fare."

And in *City of Detroit* v. *Railway Co., supra,* where
the same statute was under consideration, it was said:

"It is plain that the legislature regarded the fixing
of the rate of fare over these street railways as a
subject for agreement between the parties and not as
an exercise of a governmental function of a legisla-
tive character by the city authorities under a dele-
gated power from the legislature. It was made mat-
ter of agreement by the express command of the leg-
islature."

In 1870 the people of the State adopted an amend-
ment to the Constitution, section 1, Art. 19*a,* 1 Comp.
Laws 1897, page 128. So far as important here it
contained the following language:

"The legislature may, from time to time, pass laws
establishing reasonable maximum rates of charges for
the transportation of passengers and freight on dif-
ferent railroads in this State," * * *

As it provided for the passing of laws establishing
passenger rates these provisions were carried into the
present Constitution, Art. 12, § 7. I agree that under
these provisions the power to pass laws establishing

passenger rates, *i. e.*, the power to fix a legislative rate as applied to passenger fares, rests exclusively with the legislature and may not be delegated by it. But this provision does not prohibit the delegation to municipalities of the power to fix rates within their borders by contract and does not nullify the act of 1867 which had already delegated such power to the municipalities of the State. Manifestly the defendant, which was incorporated in 1900 under the act of 1867, cannot assail its provisions as unconstitutional. Having accepted the benefits of the act it cannot be heard to assert the invalidity of any of its provisions. *Commissioner of Railroads* v. *Railway Co.*, 130 Mich. 248, affirmed by United States Supreme Court in *Grand Rapids, etc., R. Co.* v. *Osborn*, 193 U. S. 17 (24 Sup. Ct. Rep. 310) ; *Interstate R. Co.* v. *Massachusetts*, 207 U. S. 79 (28 Sup. Ct. Rep. 26, 12 Ann. Cas. 555) ; *Winthrop* v. *Fellows*, 230 Fed. 702; *Goodspeed* v. *Wayne Circuit Judge*, 199 Mich. 273.

The case of *City of Traverse City* v. *Railroad Commission*, 202 Mich. 575, presented a different situation than is here presented. There the legislature had not in express terms delegated to the municipality the power to enter into a contract with the telephone company fixing rates, nor had the State itself entered the field. We there held that the contract or ordinance was a permissive one only and that when the State entered the field it did so to the exclusion of and untrammeled by such ordinances and contracts. But here these contracts were entered into under express authority and by command of the State. Under these circumstances both the State and the utility are bound.

In my judgment the act of 1919 here under consideration as construed by my Brothers impinges the provisions of section 10, article 1, of the Federal Constitution in so far as the contracts with the various municipalities set up in the bill of complaint are con-

cerned.   A decree should be here entered protecting and enforcing each and all of such contracts.

BIRD, J., concurred with FELLOWS, J.

BROOKE, J.   In this case I find myself unable to agree with the conclusions reached in the opinion prepared by my associate, Justice FELLOWS.

It is contended by the attorney general that the whole act is unconstitutional.

(*a*) Because its object is not sufficiently expressed in its title.

(*b*) Because the fourth proviso of section 2, which he construes as excluding from the benefit of the act electric suburban roads whose gross passenger earnings as reported in 1918, equaled or exceeded $8,000 per mile, is invalid as an arbitrary and unjust discrimination against those companies, and that the entire act must fall with it.

(*c*) Because the legislature cannot constitutionally fix rates increasing and superseding those provided in township and village franchises without the consent of those municipalities.

It is the claim of the defendant that though the 4th proviso of section 2 of the act is invalid if construed as the attorney general claims, the proviso is not essential to the act and the rest of the act may stand, and that the defendant is entitled to the benefit of the rates which it provides, but it is contended further that a proper construction of the 4th proviso of section 2 excludes roads earning in 1918 over $8,000 per mile only from the rates prescribed by the preceding first section of the act; that it has no relation to the rate of two cents per mile given by the 5th proviso in section two to roads earning $10,000 per mile and upwards and that under a proper construction of the fifth proviso the defendant is entitled to the benefit of the two-cent rate.

In approaching the consideration of a legislative en-

actment with the purpose of passing upon its constitutionality courts usually do and always should strive to sustain its validity if that may be done without doing actual violence to the language used in the act. Every intendment favorable to a conclusion sustaining the law must be indulged in. The true rule is stated in Endlich on Interpretation of Statutes, § 295, as follows:

"Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship or injustice, presumably not intended, a construction may be put upon it which modifies the meaning of the words, and even the structure of the sentence. This is done sometimes by giving an unusual meaning to particular words; sometimes by altering their collocation; or by rejecting them altogether; or by interpolating other words; under the influence, no doubt, of an irresistible conviction * * * that the modifications thus made are mere corrections of careless language, and really give the true intention."

See, also, *Commonwealth* v. *Kimball*, 24 Pick. (Mass.) 366; *State* v. *Polk County Com'rs*, 87 Minn. 325 (92 N. W. 216, 60 L. R. A. 161) ; *Bird* v. *Kenton County Com'rs*, 95 Ky. 195 (24 S. W. 118) ; *Bingham* v. *Birmingham*, 103 Mo. 345 (15 S. W. 533). With these basic principles in mind, let us examine the act in question. I may say at the outset that if the interpretation of the 4th proviso of section 2 of the act adopted by my Brother is the necessary, sole and ineluctable interpretation, I agree with him that the entire act must fail.

The situation confronting the legislature at the time the act in question received its approval was briefly as follows: A great war had been in progress for several years, this country having been engaged therein for nearly two years. As a consequence prices of labor, material, and products of all kinds had become

subject to violent and excessive increases, in many instances more than doubling. The major transportation systems of the country had been taken over by the Federal Government and placed in the hands of a director general under an act of congress which assured to the private owners of such roads specific returns upon their invested capital. Immediately the director general found it necessary to inaugurate a scale of passenger and freight rates largely in excess of those obtaining before the war, in spite of which (a matter of history of which the court may well take judicial notice), enormous monthly deficits occurred under such operation and control. If the interurban roads serving the needs of the citizens of the State throughout its entire area were to be permitted to continue to function for the benefit of the body politic and not be forced into bankruptcy, it is apparent that the *necessity* existed for legislation which would afford some relief to those companies then operating under franchises entered into at a time when the cost of labor and material was only a fraction of such cost at the time the act was passed. Confronted with this grave situation and presumably in response to an appeal from the interests affected, the legislature formulated and passed the act in question.

My Brother says:

"In view of the fact that we are forced from a study of the legislative history of the act as above set forth to the conclusion that the legislature might just as well have said in proviso 4 that this act shall not apply to the Detroit United Railway as to have used the language that it did use, we see no escape from holding that we have before us a discriminatory and special piece of legislation of the most flagrant character."

It is this conclusion with which I most emphatically disagree. That the act was intended to affect all roads within the State except those distinctly placed

outside its operation in the first three provisos of section 2 cannot be questioned. The title to the act is all-inclusive and the opening words of section 2 are:

"This act shall apply to all roads, including the so-called steam roads, electric roads, suburban roads and interurban roads."

Then follows by provisos 1, 2, and 3, the three classes of exceptions, in each of which it is stated unequivocally: "This act shall not apply," etc.

The legislative history of the act set out at large in my Brother's opinion and deemed by him to be so persuasive of the legislative intent to forever exclude the Detroit United Railway from the beneficial effects of the legislation does not impress me as it does him. In the face of the title, which in terms includes the defendant, and the reiterated statement contained in the opening language of section 2, which likewise includes defendant, it cannot be said that inconclusive language such as that used in the fourth proviso was intended by the legislature to defeat the very purpose of the act. We must presume that in framing legislation the legislature acts with a just appreciation and at least with a cursory knowledge of the constitutional limitations within which it may function. Construing proviso 4 of section 2 as does my Brother and the attorney general, the legislature wilfully and deliberately set about to do a vain thing, that is, to go through the form of placing upon the statute books an act which they must have known could not successfully stand against an attack upon its constitutionality. Considering the circumstances under which it acted and the language of the act itself, I cannot bring myself to assent to any such proposition. As before pointed out, the first three provisos making certain exceptions from the act use the language: "This act shall not apply." The fourth proviso starts out by saying: *"These rates* shall not apply." The query nat-

urally arises, What rates? The only rates so far mentioned in the act are those provided in section 1 of the act, the section immediately preceding the one containing the language in question and as affecting the point under discussion, the rate of 2½ cents per mile. By the fourth proviso it is my opinion that the legislature intended to and did exclude all roads earning more than $8,000 per mile from the rates (the 2½-cent rate) provided in section 1, but it did not intend by the use of the language employed to nullify the entire enactment. So construed, each portion of the act may be given effect and the whole may stand without objection. As was said by Chief Justice Shaw in *Commonwealth* v. *Kimball,* 24 Pick. (Mass.) 366, 370:

"When the words are not precise and clear, such construction will be adopted as shall appear most reasonable and best suited to accomplish the objects of the statute; and where any particular construction would lead to an absurd consequence, it will be presumed that some exception or qualification was intended by the legislature to avoid such conclusion,"

—and rather than pronounce a statute unconstitutional and void it is the duty of the court to—

"draw inferences from the evident intent of the legislature, as gathered from the law taken as a whole, supplying technical inaccuracies in expression and obviously unintentional mistakes and omissions by implication, from the necessity of making them operative and effectual as to specific things which are included in the broad and comprehensive terms and purposes of the law; and these inferences and implications are as much a part of the law as what is distinctly expressed therein." *State* v. *Polk County Com'rs,* 87 Minn. 325, 337 (92 N. W. 216).

We come next to the 5th proviso of section 2:

"*Provided,* that in the future whenever the passenger earnings of any electric, suburban or interurban railroad, as reported to the railroad commission at the

close of any year, shall increase so as to equal or exceed the sum of $10,000 per mile per annum for each mile of road so operated by such company, then in such case said company shall thereafter, upon the notification of the railroad commission, be required to charge not exceeding two cents per mile for the transportation of any passenger and his or her ordinary baggage as above provided."

It is conceded that the 1918 report of the passenger earnings of the defendant was not filed with the commission until after the passage of the act, therefore it may be said that the words of futurity in the language under consideration refer to that report as well as to all others to be filed in the future. In my opinion it is unimportant whether the language of futurity is so construed or disregarded. The broad and intelligent construction of the proviso is that all roads now or hereafter earning $10,000 per mile shall be required to charge not exceeding 2 cents per mile. See *Maysville, etc., R. Co.* v. *Herrick,* 13 Bush (Ky.), 122. The language there construed was:

"A married woman who shall come to this commonwealth without her husband, he residing elsewhere, may * * * bring and defend actions as an unmarried woman."

The plaintiff was a married woman who had become a resident of the State, her husband residing elsewhere, before the passage of the statute, and her right to sue was questioned accordingly.

The court said:

"To exclude her because the statute speaks only of married women "who shall come," would be to adhere to the letter of the law and to disregard its spirit. * * * And a person clearly within this class will not be denied the benefit of the remedial statute by grammatical construction at the expense of the manifest legislative intent."

See, also, *Malloy* v. *Railway Co.,* 109 Wis. 29 (85 N. W. 130).

I think that every proviso of section 2 may be and should be so construed as to give validity to the legislation, and, being so construed, the defendant is within the terms of the act and entitled under the 5th proviso to the 2-cent rate provided therein.

There remains for consideration the question of the legislative right to increase the franchise rates of a public service corporation with the consent of such corporation but without the consent of the municipality, an original party to the contract. I think it is clear from the authorities that the legislature cannot, by a grant of power to the several municipalities of the State, divest itself of the right to reassume and itself exercise such powers as are granted it in that behalf under the Constitution, among which is this power to fix reasonable rates. While not precisely in point, our own decision in *Traverse City* v. *Railroad Commission,* 202 Mich. 575, will be found to be illuminating. Upon this point, see *City of Worcester* v. *Railway Co.,* 196 U. S. 539 (25 Sup. Ct. Rep. 327); *Kies* v. *Lowrey,* 199 U. S. 233 (26 Sup. Ct. Rep. 27); *People, ex rel. Village of South Glens Falls,* v. *Public Service Com'n,* 225 N. Y. 216 (121 N. E. 777); *State, ex rel. Garner,* v. *Telephone Co.,* 189 Mo. 83 (88 S. W. 41); *Cleveland Telephone Co.* v. *City of Cleveland,* 98 Ohio St. 358 (121 N. E. 701); *State, ex rel. City of Sedalia,* v. *Public Service Com'n,* 275 Mo. 201 (204 S. W. 497).

I agree with the conclusion of the learned circuit judge upon the question of the title of the act. In my opinion it is sufficient.

The decree of the court below should be reversed and the injunction therein ordered vacated.

MOORE, C. J., and STEERE, STONE, and SHARPE, JJ., concurred with BROOKE, J.

Justice KUHN took no part in this decision.

BROOKE, J. Since the filing of the majority and minority opinions in this case, my Brother FELLOWS has added to the minority opinion a voluminous discussion touching the right of the State to resume and exercise the rate making power without the consent of the municipality which had theretofore exercised such power under express delegated authority from the State. It is asserted that in upholding the constitutionality of the act here in question, increasing rates over those theretofore fixed by contracts between municipalities and street railway companies, the opinion of the majority erred through failure to take into account the circumstance that, as said contracts were expressly authorized by statute, their obligations could not be impaired without contravening the provisions of the Federal and State Constitutions.

For the purpose of the present discussion, it may be assumed, though not decided, that the obligations of these contracts are protected by the constitutional provisions referred to. In our judgment, this circumstance affects not at all the decisions heretofore made, nor the reasoning by which that decision was reached. For it is plain that, save as restrained by these contracts from so doing, the legislature could exercise its legislative power to fix street railway rates; and it is likewise true that there is nothing in said contracts or in the statute authorizing them which deprives the legislature of its power to increase rates.

We do not overlook the statutory provisions (Street Railway Act, 1867) :

"SEC. 20. The rates  *  *  *  established by agreement  *  *  *  shall not be increased without consent of such (municipal) authorities." 2 Comp. Laws 1915, § 8551.

This provision, however, is not a contract between the State and the municipality. It is merely a delegation of State power, which, as stated in our earlier

opinion, the legislature might "reassume and itself exercise" and which, by the act in question, it did reassume and exercise.

Briefly stated, this claim might be answered thus: In enacting a law increasing these rates, the legislature did nothing more than to exercise an undoubted power of legislation which it had never contracted not to exercise. In so doing, it did not enact a law which impaired contract obligations. This view is fully supported by the case of *City of Worcester* v. *Railway Co.,* 196 U. S. 539 (25 Sup. Ct. Rep. 327), cited in our earlier opinion. In that case it was decided that the legislature, by enacting a general law, could change —to the disadvantage of the municipality—a contract legally binding upon the parties, made under express statutory authority by the municipality, with a street railway company. It is true that the change so made related to the company's obligation to maintain pavements and not to its obligation to carry passengers at rates fixed by the contract; but this is not a distinction in principle.

We are convinced that no subsequent decision of the United States Supreme Court impairs the effect of its decision in the *Worcester Case.* Many general expressions may be found in some of these cases touching the binding effect of contracts made by the municipalities under legislative authority. Such expressions are found in the following, among other, cases: *Vicksburg* v. *Waterworks Co.,* 206 U. S. 496 (27 Sup. Ct. Rep. 762) ; *Home Telephone Co.* v. *Los Angeles,* 211 U. S. 264 (29 Sup. Ct. Rep. 50) ; *Columbus, etc., Power Co.* v. *City of Columbus,* 249 U. S. 399 (39 Sup. Ct. Rep. 349) ; *City Railway Co.* v. *Citizens Street R. Co.,* 166 U. S. 557 (17 Sup. Ct. Rep. 653) ; *Detroit United Ry.* v. *Michigan,* 242 U. S. 238 (37 Sup. Ct. Rep. 87) ; and, doubtless, others may be found. But in none of these cases was the question of the right of the legis-

lature, without the consent of the municipality, to abrogate a municipal contract, made under legislative authority, whether express or implied, either raised or discussed. In some of the cases, the question was whether a municipality could, by its own action or through the interposition of legislative power, be relieved of the obligations of its contract without the consent of the other contracting party. In other cases, the question was whether the party contracting with the municipality could escape its contract obligations without the municipal consent; and in still other cases, the question was whether there was any contract impaired by the action complained of. But in none of these cases was the *Worcester Case* or the question determined in the *Worcester Case* even referred to.

The addition to my Brother's previous opinion must excuse, if it does not justify, this further discussion of the matter determined by the majority opinion of the court heretofore filed.

MOORE, C. J., and STEERE, STONE, and SHARPE, JJ., concurred with BROOKE, J.