# Staunton.

## Town of Victoria v. Victoria Ice, Light and Power Company.

### September 21, 1922.

1. Municipal Corporations—*Public Utilities—Franchise Fixing Irrevocably Rates to be Charged by Public Utility—Power of Municipality—Case at Bar.*—In the instant case, the town of Victoria challenged the validity of an order of the Corporation Commission authorizing the Victoria Ice, Light and Power Company to charge consumers in the town rates for electric current furnished them in excess of the maximum rates specified in the ordinance which granted the company the right to construct, maintain and operate its lines in the streets within the limits of the town, upon the ground that the ordinance constituted a contract with the company limiting the rates to be charged, which was inviolable.

   *Held:* That unless section 125 of the Constitution of 1902 and the corresponding statute, section 3016 of the Code of 1919, conferred unlimited power upon the town to enter into an inviolable contract establishing the rates specified therein, then clearly that power did not exist, and that those provisions did not confer such power upon the town.

2. Corporation Commission—*Powers—Power of the Legislature to Vest the Commission with Additional Powers—Section 156-c of the Constitution of 1902.*—Section 156-c of the Constitution of 1902, unless otherwise qualified, manifestly authorized the General Assembly to vest the Corporation Commission with plenary power to prescribe and enforce rates and charges of all public service corporations, because unquestionably the State has the right to vest the commission with power to prescribe the rates to be charged in connection with the business of such corporations. This general power, then, can only be limited by a specific contract duly made with some public service corporation by the State or under its express authority.

3. Municipal Corporations—*Franchises to Public Utilities—Section 125 of the Constitution of 1902 and Section 3016 of the Code of 1919—Reasonable Rates.*—Constitution of 1902, section 125, and the act (Acts 1902-1904, p. 412, now Code, section 3016) were not an unrestricted grant of power to the municipalities in this State either to prescribe rates or to enter into contracts whereby specific rates could be irrevocably

fixed, but are merely restrictions upon the municipalities which limit and prescribe the methods by which the right to use and occupy the streets and other public property was to be granted to the public service corporations by municipal ordinance, and even if the statute is construed as granting the power to enter into contracts which specify rates, such contractual power is not unlimited, and any exercise thereof is subject to the limitation implied in section 125, repeated in the statute, and otherwise expressed, namely, that such rates must at all times be reasonable. Overruling *Virginia Western Power Co.* v. *Clifton Forge*, 125 Va. 469, 99 S. E. 723.

4. Municipal Corporations—*Irrevocable Franchise to Public Utility Company Fixing Rates—Grant of such Franchise Must be Clearly Conferred.* Municipal authority to grant a public utility company a franchise irrevocably fixing the rates to be charged by the public utility company during the period of the franchise must be clearly conferred, and, if not so conferred, the power of the State to regulate and prescribe such rates is undiminished.

5. Municipal Corporations—*Authority to Grant Irrevocable Franchise to a Public Utility Company Fixing Rates—Constitutional Provisions.*—A consideration of section 159 of the Constitution of 1902, with reference to the police power, and section 164 of the Constitution of 1902, with reference to the right of the Commonwealth to fix and limit the charges of public service corporations, and section 156-c of the Constitution of 1902, as to the powers of the State Corporation Commission, leads to the conclusion that the convention which adopted them could hardly have intended to be so inconsistent as at the same time, by section 125 of the Constitution of 1902, either to surrender or to authorize the General Assembly thereafter to surrender to the municipalities the unlimited power by contract to specify the rates for certain public service corporations, and thus to abridge the right of the State which had been so carefully and specifically reserved by section 164 of the Constitution of 1902.

6. Municipal Corporations—*Franchise Fixing Rates of Public Service Corporation—Authority to Grant—Effect of the Word "Reasonable" in Section 125 of the Constitution of 1902.*—Section 125 of the Constitution of 1902, regulating the granting of franchises by municipalities to public service corporations, contains a specific requirement that the grant shall make adequate provision by way of forfeiture or otherwise to secure service at reasonable rates. The word "reasonable," which is here applied directly to rates, is significant, descriptive, and cannot be ignored. If given its obvious meaning, it limits the power conferred. An unalterable rate may be reasonable when established, but become unreasonable thereafter because of changed conditions. The use of the word "reasonable" negatives the idea that it was intended to confer unlimited contractual power upon the

municipality, and clearly implies the reservation of the supervisory and regulative power of the State, which is otherwise and elsewhere so clearly and repeatedly expressed in the Constitution. That this section is thus construed by the General Assembly is apparent from section 4054 and sections 4064 to 4073, inclusive, of the Code of 1919.

7. Corporation Commission—*Public Utility Companies—Power of Commission to Fix Rates and Regulate Public Service Corporations—Acts of 1918, pp. 413, 673.*—Sections 4054, 4064, and 4071 of the Code of 1919, in regard to the revision by the Corporation Commission of rates established by municipal corporations and the control of the Commission over public service corporations and the fixing by the Commission of rates to be charged by such corporations, has not been repealed by Acts 1918, pp. 413, 673, the amendments contained in that act being designed to confirm and strengthen the power of the Commission.

8. Municipal Corporations—*Franchise Fixing Rates of Public Service Corporations—Reasonableness of Rates.*—There is doubtless a presumption that rates fixed by a franchise granted a public service corporation by a municipality are reasonable. Until abrogated by the State, they are obligatory upon the contracting parties, but neither the State nor the public are parties thereto, and the State is free at any time to intervene and exercise its reserved power for the common good.

9. Municipal Corporations—*Franchise Fixing Rates to be Charged by Public Service Corporation—Jurisdiction of the Corporation Commission.*— The Constitution provides that the legislative and police power as to the regulation of rates shall never be surrendered or abridged; that municipalities may grant franchises which under certain conditions shall make adequate provision to secure efficiency of public service at reasonable rates; and authorizes the General Assembly to vest the Corporation Commission with plenary power to regulate the rates of all public service corporations. By statute all public utilities are subjected to the control of the State Corporation Commission, with power to prescribe just and reasonable rates in lieu of any found upon investigation to be unjust and unreasonable. Therefore the jurisdiction of the Commission to determine the question as to the reasonableness of rates fixed by a municipal franchise is clear.

10. Municipal Corporations—*Public Service Corporations—Contracts Fixing Rates to be Charged—Power of State Corporation Commission—Impairment of Obligation of Contracts.*—The overwhelming weight of authority is to the effect that a municipality, in the absence of any direct regulation of rates by the State, may enter into a contract with a public utility whereby the rates to be charged for service to the public are fixed, which contract, as between the parties themselves, is binding. The State nevertheless has power which it may

delegate to a commission to change such rates whenever, because of changed conditions, such rates are no longer reasonable. Franchise rate contracts, unless clearly authorized by the State, are such contracts as may be changed by the State without infringing the constitutional guarantee against impairment of the obligation of contracts.

11. Police Power—*Power to Regulate and Fix Rates of Public Service Corporations.*—In Virginia the police power and the express right to regulate and prescribe rates of public service corporations are repeatedly reserved to the State in the Constitution, and, so far as not directly exercised or limited by the Constitution, reside unimpaired in the General Assembly. This inherent and paramount sovereign power, so frequently asserted, reiterated, and reserved in the Constitution, cannot be defeated or abridged by any contract made under the authority of Code of 1919, section 3016, and since the present Constitution became effective, but such contracts must be construed as subordinate to such reserved power of the State to prescribe rates, just as if such reservation were expressed therein.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*N. S. Turnbull, Jr.*, for the appellant.

*Geo. E. Allen* and *E. Randolph Williams*, for the appellee.

Prentis, J., delivered the opinion of the court.

The town of Victoria complains of orders of the State Corporation Commission of January 3 and January 27, 1921, by which it assumed jurisdiction and authorized the Victoria Ice, Light and Power Company, Inc., to charge consumers in the town rates for electric current furnished them, in excess of the maximum rates specified in the ordinance of January 27, 1914, which granted the company the right to construct, maintain and op-

erate its lines under, upon, along and across the streets, alleys, avenues, bridges and public grounds within the limits of the town for the purpose of transmitting electricity to consumers of light, heat and power. The company is a public service corporation, vested with the rights and charged with the duties of such corporations.

The town, by plea and answer, denied the jurisdiction of the Commission, upon the ground that the company is operating under a franchise ordinance adopted and accepted before the 1914 acts (Code sections 4054 and 4064) became effective, which by contract irrevocably limits the maximum rates to be charged by the company, so that they can only be increased by consent of the town.

The Commission recognized the rule laid down by this court in *Virginia Western Power Co.* v. *Clifton Forge,* 125 Va. 469, 99 S. E. 723, 9 A. L. R. 1148, holding that the Commission has no jurisdiction in such cases, but nevertheless took jurisdiction in this case upon the ground that (under Constitution, sections 124, 125) the franchise granted by the town here is invalid because it was not adopted by a vote of three-fourths of all of the members elected to the council.

For the reason indicated in an opinion this day handed down in the case of *Town of Victoria* v. *Victoria Ice, Light and Power Co., ante* p. 124, 114 S. E. 89, from the Circuit Court of Lunenburg county, we are of the opinion that the franchise is valid and effective.

The town then challenges the validity of the order increasing the rates to consumers, upon the ground that the ordinance constitutes a contract with the company limiting the rates to be charged, which is inviolable, and confidently relies upon *Virginia Western Power Co.* v. *Clifton Forge, supra,* which sustains that view, while the company is here claiming that notwithstanding the

ruling in that case, the ordinance here involved does not constitute such a contract as to rates, and that by the express provisions of the act of 1914, Code, sections 4054, 4064 to 4073, inclusive, as amended, the Commission has been vested with plenary power to regulate and prescribe just and reasonable rates, notwithstanding such ordinance. This then raises the ultimate and decisive question in the case.

[1, 2] Under well established rules, unless section 125 of the Constitution and the corresponding statute, Code, section 3016, confer such unlimited power upon the town to enter into an inviolable contract establishing the rates specified therein, then clearly that power does not exist.* Whether we refer to this provision or to the statute, the language to be constued is identical. Of course the statute must be construed as subordinate to the other pertinent sections of the Constitution inconsistent therewith. For instance, in section 156-c this appears, referring to the State Corporation Commission: "The Commission may be vested with such additional powers and charged with such

---

*"*Section 125. Sale of corporate property and granting of franchises by cities and towns.*—The rights of no city or town in and to its water front, wharf property, public landings, wharves, docks, streets, avenues, parks, bridges, and other public places, and its gas, water, and electric works shall be sold except by an ordinance or resolution passed by a recorded affirmative vote of three-fourths of all the members elected to the council, or to each branch thereof where there are two, and under such other restrictions as may be imposed by law; and in case of the veto by the mayor of such an ordinance or resolution, it shall require a recorded affirmative vote of three-fourths of all the members elected to the council, or to each branch thereof where there are two, had in the manner heretofore provided for in this article, to pass the same over the veto. No franchise, lease or right of any kind to use any such public property or any other public property or easement of any description, in a manner not permitted to the general public, shall be granted for a longer period than thirty years. Before granting any such franchise or privilege for a term of years, except for a trunk railway, the municipality shall first, after due advertisement, receive bids therefor publicly, in such manner as may be provided by law, and shall then act as may be required by law. Such grant, and any contract in pursuance thereof, *may provide that upon the termination of the grant* the plant as well as the property, if any, of the grantee in the streets, avenues, and other public places shall thereupon, without compensation to the grantee, or upon the payment of a fair valuation therefor, be and become the property of the said city or town; but the grantee shall be entitled to no payment by reason of the value of the franchise; and any such plant or property acquired by a city or town may be sold or leased, or if authorized by law, maintained, controlled and operated, by such city or town. Every such grant shall specify the mode of determining any valuation therein provided for, and shall make adequate provision by way of forfeiture of the grant or otherwise, to secure efficiency of public service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant. Nothing herein contained shall be construed as preventing the General Assembly from prescribing additional restrictions on the powers of cities and towns in granting franchises or in selling or leasing any of their property, or as repealing any additional restriction now required in relation thereto in any existing municipal charter."

other duties (not inconsistent with this Constitution) as may be prescribed by law in connection with the visitation, regulation, or control of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges in connection therewith.'' This section, unless otherwise qualified, manifestly authorizes the General Assembly to vest the commission with plenary power to prescribe and enforce rates and charges of all public service corporations, because unquestionably the State has the right to vest the commission with power to prescribe the rates to be charged in connection with the business of such corporations. This general power then can only be limited by a specific contract duly made with some public service corporation by the State or under its express authority.

The case has this feature, that opposing counsel rely upon the same general propositions of law which are generally accepted, and which have so recently been examined and restated by this court both in the *Virginia Western Power Co. Case* and in *City of Richmond* v. *Chesapeake and P. Telephone Co.*, 127 Va. 612, 105 S. E. 127.

We feel impelled to re-examine the precise conclusion reached in the *Virginia Western Power Co. Case*, and this makes it necessary to restate that conclusion.

It is expressly there held that municipalities in this State have no power, either under the Constitution or general statutes, to prescribe rates (as distinguished from the power to contract therefor) to be charged by any public service corporation. As to contracts, it is there held to be equally well settled that, for the very reason that a contract regulating rates, in its effect, extinguished *pro tanto* an undoubted power of govern-

ment, therefore its existence as well as the authority to make it must clearly and unmistakably appear; and that all doubts must be resolved in favor of the continuance of the power is likewise distinctly and unequivocally recognized in that case. Citing *Home Telephone & Telegraph Co.* v. *Los Angeles*, 211 U. S. 265, 53 L. Ed. 182, 29 Sup. Ct. 50. Then, citing a number of other cases in which it has been held that certain municipalities have no such contractual power, the opinion proceeds thus: "It appears in various ways in these causes that the municipalities either were not vested with the power to contract, or, if so, were not vested with that power unlimited. And in the cases of the latter character, the limitation on such power, consisting in the reservation of the right of future exercise of the power of regulation, is disclosed in various ways— as where a general State statute providing for the exercise of the continuing power of regulation was in force at the time of the grant of the municipal power in question, or where it otherwise appears that such reservation of such continuing power was made. None of these cases controverts the well-established rule of law above adverted to, namely, that if the municipality which grants a franchise, such as those involved in the cases before us, has expressly conferred upon it by statute the unlimited power to contract with the grantee of the franchise on the subject of fixing the rates which may be charged for public service rendered thereunder during the franchise period, and the municipality does so contract and the franchise is accepted by the grantee of it and the grantee acts under it, the contract is irrevocable during its life without the assent of the municipality, as well as of the holder of the franchise, to a change in rates, and the rates cannot be changed in violation of the franchise provisions by the consent

of only one party to the franchise contract." The opinion then holds that Constitution, section 124,* does not confer such power to contract as to rates, and that unless conferred by some other provision or statute the power does not exist; that notwithstanding the control of the municipalities over their streets under that section, the power to regulate rates is held to be reserved in the State, which may be infused with life by appropriate legislation, and in such case the initial rates fixed by the franchise as the condition of the consent of the municipality to the occupation of its streets "will be taken to be fixed subject to the reserved power of the State to regulate the rates in the future as the public welfare may demand, and that status will be taken to be so understood by the grantee as well as the grantor of the franchise." It then proceeds to hold that the statute (Code, section 3016), which is substantially identical with the Constitution, section 125, and based thereon, does confer this unlimited power to enter into inviolable contracts, saying this: "We see that that section of the Constitution expressly provides that, while nothing therein 'contained shall be construed as preventing the General Assembly from prescribing *additional restrictions on the powers of* cities and towns in granting franchises * * ' every franchise, such as those involved in the case before us, 'shall * * make * * provision to secure efficiency of public service at reasonable rates; * *' and we see that that is a power to contract as to the rates during the whole franchise period. And no limitation whatever is placed on such power to contract, except that the franchise period is

---

*"*Section 124. Consent of corporate authorities necessary to use of streets, alleys or public grounds by certain companies or persons.*—No street railway, gas, water, steam, or electric heating, electric light or power, cold storage, compressed air viaduct, conduit, telephone or bridge, company, nor any corporation, association, person or partnership, engaged in these or like enterprises, shall be permitted to use the streets, alleys, or public grounds of a city or town without the previous consent of the corporate authorities of such city or town."

limited so that it may not exceed thirty years, and that the franchise shall be offered for sale after due advertisement, bids therefor to be received publicly in a manner to be provided for by law. There is no question raised in the cases before us, but that such requirements were all fulfilled, in the granting of the franchises in question. And we see from the reading of the whole of this section that it plainly expresses the intention that, in the absence of such 'other restrictions (on their powers) as may be imposed by law,' municipalities are intended by this section to be clothed by the legislature with the unlimited power to contract by the franchise with the grantee thereof on the subject of fixing the rates which may be charged for services rendered the public thereunder during the whole franchise period." This is further stated: "We conclude, therefore, that the statute law, in existence when and under which the franchises involved in the cases before us were granted, expressly delegated to the municipalities the unlimited authority to contract with the grantee of such franchises on the subject of fixing the rates of charges, aforesaid, thereunder, during the whole of the franchise periods."

[3, 4] It clearly appears then that this conclusion is based solely upon the language quoted from Constitution, section 125, and repeated in the statute. Scrutinizing this language and its context, we observe that it appears in a section, the prime object of which is not to grant power but to restrict municipalities in the methods by which their power to grant the use of their streets (otherwise conferred) is exercised. We further observe that it appears therein not in direct connection with the power to grant, but only in immediate connection with the right to acquire the plant and property of the utility at the termination of the grant—this be-

ing the precise language of the clause: "Every such grant shall specify the mode of determining any valuation therein provided for, and shall make adequate provision by way of forfeiture of the grant or otherwise, to secure efficiency of public service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant." Such safeguarding provisions might prove quite desirable to a municipality which contemplated the acquisition of a plant operated under a franchise which is about to expire at a time when the grantee might have a selfish motive to allow the property to deteriorate and the service to become inefficient. Then observe again the nature of the provision itself, which is to "make adequate provision by way of forfeiture of the grant or otherwise." Forfeiture would be neither desired nor desirable if relief against excessive rates were the chief end sought; for, if provided for by contract, such relief would doubtless be best secured by requiring specific performance, and if not then by public regulation. It must not, however, be overlooked that it is conceded that the authority to make such contracts cannot rest in doubtful disputations. The power claimed must be clearly conferred, and if not so conferred, the power of the State to regulate and prescribe such rates is undiminished. The language here relied on appears to be so inconclusive and of such doubtful import as to create a doubt which discussion and reflection do not remove. This doubt being fair and justifiable denies the power.

Let us, then, also consider some of the constitutional provisions and statutes which expressly deny the power claimed by the town.

[5] It is everywhere conceded that the authority to prescribe rates is a governmental legislative function, which is exercised under the police power of the State.

Constitution, section 159, has this with reference to the police power: "The exercise of the police power of the State shall never be abridged, nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the State."

Then there is Constitution, section 164, which reads: "The right of the Commonwealth, through such instrumentalities as it may select, to prescribe and define the public duties of all carriers and public service corporations, to regulate and control them in the performance of their public duties and to fix and limit their charges therefor shall never be surrendered or abridged."

A consideration of these sections leads to the conclusion that the convention which adopted them could hardly have intended to be so inconsistent as at the same time, by section 125, either to surrender or to authorize the General Assembly thereafter to surrender to the cities and towns the unlimited power by contract to specify the rates for certain public service corporations, and thus to abridge the right of the State which had been so carefully and specifically reserved by section 164. To so hold is to construe section 125 as authorizing municipalities by contract to nullify three other sections of the Constitution. If section 125 does nevertheless authorize such a surrender of the public right so carefully reserved, then all will agree, for this is fundamental, that the language relied on, when put in apposition to the language used in sections 156-c, 159 and 164, should be so clear, definite and positive as to deny and overcome their implications and leave no fair doubt upon the mind. This then leads us again to section 125, to a further scrutiny of the language there used as contrasted with the other three constitutional provisions just cited, in order to ascertain

10

whether the convention nevertheless did thereby sur-
render this public right as to such municipal franchise
contracts. The authority to regulate and prescribe
rates, it is conceded, rests in the police power of the
Commonwealth, and is a legislative function. How,
then, by this obscure language can we successfully main-
tain that it is clear that the State has thereby under-
taken to surrender to the municipalities the authority
to secure by contract rights which are paramount to
the police power and legislative functions which under
sections 159 and 164 the State has declared shall never
be either abridged or surrendered?

Upon further reflection we think that this provision
so relied on should not be construed as either surrender-
ing or abridging such legislative power. We find our-
selves in accord with the general view that such con-
tractual powers as were thereby conferred are expressly
limited by and subject to the reserved power of the
State to intervene and prescribe such rates; and that
contracts made by authority of section 125 and the
statute are likewise so limited as effectively as if these
other constitutional limitations were expressed in such
contracts.

[6] There is another inquiry which must be answered:
What is meant by the specific requirement that the
grant shall make adequate provision by way of forfeit-
ure or otherwise to secure service at reasonable rates?
The word "reasonable" which is here applied directly to
rates is significant, descriptive and cannot be ignored.
If given its obvious meaning, it limits the power con-
ferred. Unless this be true, it is without meaning, inop-
erative and superfluous. Is it clear, then, that this lan-
guage means that the General Assembly can surrender
to the corporation and the municipality the right by
contract to establish and maintain specific rates, unal-

terable for thirty years, whether they are reasonable or unreasonable? An unalterable rate may be reasonable when established but become unreasonable thereafter because of changed conditions. So the asserted power to contract for such unalterable rates is irreconcilable with and destructive of the authorized power to make adequate provision for reasonable rates. Then there is the requirement that the grant shall contain provisions which are adequate to secure such reasonable rates, and how can it be maintained that the bare enumeration of specific and unalterable rates is adequate to secure reasonable rates for thirty years. The reasonableness of rates at any particular period can only be determined by many considerations, such as the value of the property then devoted to the public service, the cost of the service which, in the nature of things, varies from time to time, the efficiency of the service, as well as its value to the consumers. Certainly all these enter into the problem, so that one who relies upon such a franchise contract limitation must assume the burden of showing that the constitutional requirement imposed by section 125, that the contract shall make adequate provision for efficient service, at reasonable rates, has been observed. Surely there can be no doubt about the proposition that there should be some remedy for one who asserts that such a grant, otherwise regular, is in this respect invalid because it violates the Constitution and fails to make such adequate provision for reasonable rates, either by forfeiture of the grant or otherwise. Certainly he should be afforded the opportunity of stating and proving his contention before some tribunal provided by law for the decision of such a fair question. Otherwise authority to make such adequate provision is held to justify inadequate provision, and power to provide for reasonable rates is held to authorize and protect contracts for un-

reasonable rates. The Convention appears to have had this very contingency in contemplation when it provided by section 156-c that the commission might be vested with additional powers in connection with the visitation, regulation or control of corporations, or the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges for the service. It should not be presumed from such language as that used in section 125 that the State thereby intended to surrender the police power. Clearer language than this is needed to indicate that the State has abdicated or renounced to municipalities its legislative power to regulate rates. Indeed, the language of that very section again emphasizes the undeviating purpose of the State to insist that such rates, whether established by contract or otherwise, shall at all times be reasonable. The use of the word "reasonable" there negatives the suggestion that it was thereby intended to confer unlimited contractual power, and clearly implies the reservation of the supervisory and regulative power of the State which is otherwise and elsewhere so clearly and repeatedly expressed. That this section is thus construed by the General Assembly is apparent from the Acts of 1914, now Code, section 4054 and sections 4064 to 4073, inclusive.

Sections 4054, 4064 and 4071 read:

"*Sec. 4054. Rates established by municipal corporations to be subject to revision by State Corporation Commission.*—Upon complaint by anyone aggrieved that any rate, charge or practice established or provided for by any municipal ordinance, franchise or other contract, is unreasonable, unjust, insufficient or discriminatory, the State Corporation Commission shall order a hearing, and if, upon such hearing, it shall find that such com-

plaint is well founded, the said Commission shall prescribe and enforce just and reasonable rates, charges, or regulations, in lieu of.those complained of."

"*Sec. 4064. Public utility companies deemed public service corporations; duties.*—Every company operating any public utility in this State shall be deemed a public service corporation within the meaning of the Constitution and the laws of the State of Virginia relating to public service corporations, and as such shall be subject to the control of the State Corporation Commission."

"*Sec. 4071. Commission to fix rates and regulations.*— If upon investigation the rates, tolls, charges, schedules, or joint rates of any public utility operating in this State shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or to be preferential or otherwise in violation of any of the provisions of law, the State Corporation Commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges, or schedules as shall be just and reasonable."

[7, 8] While the act of 1914 has been amended (Acts 1918, pp. 413, 673), these amendments do not repeal the sections just quoted, but were designed to confirm and strengthen the power of the commission. There is doubtless a presumption that such franchise contract rates are reasonable. Until abrogated by the State, they are obligatory upon the contracting parties, but neither the State nor the public are parties thereto, and the State is free at any time to intervene and exercise its reserved power for the common good.

[9] So, we have the Constitution providing that the legislative and police power as to the regulation of rates shall never be surrendered or abridged. We find the cities authorized to grant franchises which under certain conditions shall make adequate provision to secure efficiency of public service at reasonable rates; the Con-

stitution authorizing the General Assembly to vest the
Commission with plenary power to regulate the rates of
all public service corporations; and this followed by the
statute expressly subjecting all public utilities to the
control of the State Corporation Commission, providing
for investigations by the Commission, with power to pre-
scribe just and reasonable rates in lieu of any found
upon such investigation to be unjust and unreasonable.

If upon such investigation and hearing it appears that
the franchise ordinance involved does make adequate
provision by way of forfeiture or otherwise for reason-
able rates, it satisfies the public right, so clearly re-
served in the Constitution; but in order to ascertain
whether or not it does so, and that there may be no
doubt about it, the State has exercised its theretofore
dormant power and provided the tribunal for testing
the adequacy of the provision and the reasonableness of
such rates. Therefore, the jurisdiction of the Commis-
sion to hear and determine such questions appears to be
clear, full and adequate.

In the case of *Winfield* v. *Public Service Commission,*
187 Ind. 53, 118 N. E. 535, P. U. R. 1918-B, 747, a kin-
dred question was considered. There the statute under
which the contract was made empowered the board of
public works "to authorize * * * telephone * * *
companies to use any street, alley or public place in such
city, and erect necessary structures therein, to prescribe
the terms and conditions of such use, and to fix by con-
tract the price to be charged to patrons," subject to the
approval of the common council. With reference to
this the court said: "Such general provisions are held
not to grant authority to cities to make contracts bind-
ing the State to any exemption therein stated in favor
of public service companies from State regulation.
*Milwaukee El. Ry. Co.* v. *Commission,* 238 U. S. 174, 35

Sup. Ct. 820, 59 L. Ed. 1254; *City of Benwood* v. *Commission*, 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261." And later in the same opinion said this: "Section 8938 further provides, in substance, that in such franchises the cities and towns shall also 'provide for the terms on which such water, * * * electricity, and so forth, shall be supplied to the city or town and to its inhabitants, as well as for reasonable license fees or other compensation to be paid to such city or town for any such franchise and privilege.' By the express wording of this grant to cities of power, the legislature stipulates that said fees and compensation to the city shall be reasonable. The city and the utility company are not at liberty, under this section, to contract as they please, independent of the State's supervisory powers. The power to declare what is reasonable in such matters is, primarily, a legislative function. *Louisville, etc., R. Co.* v. *Garrett*, 231 U. S. 305, 34 Sup. Ct. 48, 58 L. Ed. 229; *Stone* v. *Trust Co.*, 116 U. S. 307, 347, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77; *Louisville, etc., R. Co.* v. *Mottley*, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; *Reagan* v. *Farmers' L. & Tr. Co.*, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *Atlantic Coast Co.* v. *Commission*, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398; *Grand Trunk R. Co.* v. *Commission*, 221 U. S. 400, 31 Sup. Ct. 537, 55 L. Ed. 786. Hence the force of the provision that such fees and compensation must be reasonable. The State gives up by this provision none of its power or right to determine what is a reasonable fee or compensation, but reserves this right and power, and by the use of the word 'reasonable' restricts the power of the city. *Milwaukee El. R. Co.* v. *Commission*, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254."

In the recent case of *Salt Lake City* v. *Utah Light & Traction Co.*, 52 Utah 210, 223, 173 Pac. 556, 561, 3 A. L. R. 725, P. U. R. 1918F, 377, this language, so appropriate and applicable in view of the Virginia Constitution and statutes, appears: "It is now settled law that so long as the State does not interfere the rates agreed upon between the cities and the street railway companies in the franchise ordinances are binding and enforceable. Neither party, without the consent of the other, may disregard any rate that is agreed upon between them. Either party may, however, make application to the Utilities Commission, if one is created by legislative enactment, for the purpose of being relieved from the rates fixed in the franchise ordinance, and if it be made to appear that the rates under existing conditions have become unfair or unreasonable, in that they are either too high or too low, the commission may establish a rate which will again respond to the existing conditions, and may so adjust it as to make it fair, just and reasonable both to the railway company and to the public. In doing that the constitutional rights of the parties are neither invaded nor disregarded, for the simple reason that when the original rate was fixed by agreement it was still subject to modification at any time by the sovereign power of the State, providing the fare as fixed is found to be unfair and unreasonable. Every contract fixing rates entered into between the cities of this State and street railway companies, both under the Constitution and the statute, is always subject to change by the paramount power of the State, and the right of the State to so change the rates continues unless and until the legislature has in express terms surrendered the power or delegated it to some other arm of the State."

In *State ex rel. Sedalia* v. *Public Service Commission*

(1918), 275 Mo. 201, 204 S. W. 497, P. U. R. 1919-C, 507, in concluding a discussion of the effect of a provision in the Constitution of Missouri similar to section 159, to the effect that the exercise of the police power of the State shall never be abridged, it is said: "Under it the sovereign police power of the State is preserved intact, irrespective of contracts with reference to rates for public service. Under it no contract as to rates will stand as against the order of the Public Service Commission for reasonable rates, whether such reasonable rates be lower or higher than the contract rate."

[10] There are exhaustive notes on the subject in 3 A. L. R. 738 and 9 A. L. R. 1165, and many cases are there cited showing that there is little conflict in the authorities. The overwhelming weight of authority is to the effect that a municipality, in the absence of any direct regulation of rates by the State, may enter into a contract with a public utility whereby the rates to be charged for service to the public are fixed, which contract, as between the parties themselves, is binding. The State nevertheless has power which it may delegate to a commission to change such rates whenever, because of changed conditions, such rates are no longer reasonable. Franchise rate contracts, unless clearly authorized by the State, are such contracts as may be changed by the State without infringing the constitutional guarantee. The underlying reasons indicated in numerous decisions which support the above statement rest on two general grounds—either that such contracts must be deemed to have been entered into with knowledge of the inherent reserved power of the State to alter them when necessary to do so for the public welfare, or, that municipalities being mere agents of the State, the State itself may at any time waive the rights of the municipalities in the contracts.

That franchise rate contracts must be deemed to be made subject to this governmental power of the State to alter for the public welfare, is held in a very large number of cases, and in these States: California, Idaho, Florida, Illinois, Indiana, Maine, Michigan, Missouri, Montana, Nebraska, New York, Oklahoma, Oregon, Pennsylvania, Utah, Washington and West Virginia. Cited in notes 3 A. L. R. and 9 A. L. R., *supra.*

Among numerous recent pertinent cases which have not already been cited in this opinion are: *Traverse City* v. *Michigan Railroad Commission*, 202 Mich. 575, 168. N. W. 481, P. U. R. 1918-F, 752; *People, ex rel. South Glens Falls* v. *Public Service Commission*, 225 N. Y. 216, 121 N. E. 777, P. U. R. 1919-C, 374; *Pawhuska* v. *Pawhuska Oil & Gas Co.*, 64 Okl. 214, 166 Pac. 1058, P. U. R. 1917-F, 226; S. C., 250 U. S. 394, 63 L. Ed. 1054, 39 Sup. Ct. 526; *Woodburn* v. *Public Service Commission*, 82 Or. 114, 161 Pac. 391, L. R. A. 1917-C, 98, Ann. Cas. 1917-E, 996, P. U. R. 917-B, 967; *Leiper* v. *Balt. & P. R. Co.*, 262 Pa. 328, 105 Atl. 551, P. U. R. 1919-C, 397; *Re Searsport Water Co.*, 118 Me. 382, 108 Atl. 452, P. U. R. 1920-C, 347; *Groesbeck* v. *Detroit, etc., R. Co.*, 210 Mich. 227, 177 N. W. 726, 1023.

Again there is authority to the effect that while franchise contracts as to rates may have been valid when made, the city as one of the contracting parties was only acting as agent of the State, and as principal the State may at any time waive any of its rights therein. This has been held in *Salem* v. *Salem Water Co.*, 255 Fed. 295, 166 C. C. Q. 465, P. U. R. 1919-C, 956, and by the State courts in Delaware, Idaho, Indiana, Maine, Massachusetts, New Jersey, New York, Oregon and Washington. Note 3 A. L. R. 742. It is unnecessary to consider that view here because in no State have the express reservations of the legislative and police power of con-

trol by the State over the rates of public service corporations been more emphasized and reiterated than in the sections of the Virginia Constitution to which we have referred.

[11] Upon further consideration, then, we restate our conclusions which determine this case thus:

1. That in Virginia the police power and the express right to regulate and prescribe rates of public service corporations are repeatedly reserved to the State in the Constitution, and so far as not directly exercised or limited by the Constitution reside unimpaired in the General Assembly;

2. That this inherent and paramount sovereign power, so frequently asserted, reiterated and reserved in the Constitution, cannot be defeated or abridged by any contract made under the authority of Code, section 3016, and since the present Constitution became effective, but such contracts must be construed as subordinate to such reserved power of the State to prescribe rates, just as if such reservation were expressed therein;

3. That Constitution, section 125, and the (Acts 1902-3-4, page 412, now Code, section 3016), were not an unrestricted grant of power to the municipalities in this State either to prescribe rates or to enter into contracts whereby specific rates could be irrevocably fixed, but are merely restrictions upon the municipalities which limit and prescribe the methods by which the right to use and occupy the streets and other public property was to be granted to the public service corporations by municipal ordinance; and that even if the statute is construed as granting the power to enter into contracts which specify rates, such contractual power is not unlimited, and any exercise thereof is subject to the limitation implied in that section, repeated in the statute, and otherwise expressed, namely, that such

rates must at all times be reasonable. To the extent that the *Virginia Western Power Co. Case* held otherwise, it is disapproved.

4. That the State having reserved the right to prescribe rates, the General Assembly has exercised this power for the State by the Acts of 1914, superseded by Code, sections 4054 and 4064 to 4073, inclusive, as amended (Acts 1818, p. 673), and thereby designated the tribunal and prescribed the procedure for the investigation of such rates thus specified by municipal ordinance adopted since the present Constitution became effective; that the State Corporation Commission is thereby expressly vested with jurisdiction, after investigation and hearing, to prescribe different rates adjudged to be reasonable, anything in such ordinance to the contrary notwithstanding; excepting therefrom, however, such contracts, if any there be, as may have been authorized by the State before the present Constitution became effective.

5. That the commission has jurisdiction over the rates here involved.

These conclusions are amply supported by many precedents in other States construing analogous statutes, some of which have been cited.

*Affirmed.*

Burks, J., concurs in result.

Sims, J., dissenting:

I find myself unable to concur in the majority opinion.

After a thorough consideration of the subject in the light of all the positions taken and authorities cited by counsel and in the majority opinion, I am unshaken in

the view that the conclusion reached in *Virginia West-
ern Power Co.* v. *Clifton Forge*, 125 Va. 469, 99 S. E.
723, 9 A. L. R. 1148, as to the proper construction of
the statute law in Virginia under which was granted
the franchise involved in those cases (which is the same
as that under which the franchise in the instant case
was granted), is correct.  This conclusion is stated in
the opinion in the *Virginia Western Power Co. Cases*,
at pp. 493-4 of the report of those cases in 125 Va., at
pp. 730, 731 of 99 S. E. (9 A. L. R. 1148), as follows:
"We conclude, therefore, that the *statute law*, in exist-
ence when and under which the franchises involved in
the cases before us were granted, expressly delegated
to the municipalities the unlimited authority to con-
tract with the grantee of such franchises on the subject
of fixing the rates of charges aforesaid thereunder during
the whole of the franchise period." (Italics supplied).

As pointed out in the *Virginia Western Power Co.
Cases* at p. 492 of 125 Va., at p. 730 of 99 S. E. (9 A.
L. R. 1148), it appears from the reading of section 125
of the Virginia Constitution, "that it plainly expresses
the intention that, in the absence of such 'other re-
strictions (on their powers) as may be imposed by law,'
municipalities are    *    *    *    to be clothed *by the legis-
lature* with the unlimited power *to contract* by the fran-
chise with the grantee thereof on the subject of fixing
the rates which may be charged for services rendered
the public thereunder during the whole franchise pe-
riod." But it is there added that, on this subject, this
section of the Constitution is not self-executory and
needs subsequent legislation to confer upon municipali-
ties the power of making franchise contracts.  In other
respects this section is self-executory, but that was im-
material to those cases (as it was to the case now under
review), and hence was not mentioned.  The section

was not referred to as itself conferring the power in question but as recognizing that the legislature might do so. The statute law was referred to as conferring such power in express terms. See 125 Va. pp. 491-3, 99 S. E. 730 (9 A. L. R. 1148).

As pointed out in the opinion in the *Virginia Western Power Co. Cases*, section 124 deals with the power of municipalities to impose conditions upon its consent to the use of its streets, etc., by the public utility corporations mentioned. This power is absolute and unlimited; under it the municipalities may impose any condition they choose, however unreasonable; and it vests in municipalities the power to make a stipulation as to what the rate charges of the utility corporation shall be during the whole franchise period as a condition upon which the consent aforesaid is given. There is no room to doubt the unlimited character of this power, or to question that by acting under it municipalities may acquire vested rights which are absolute property rights. But property rights, however absolute, cannot, merely because they are absolute and vested rights, be held immune from the exercise of the sovereign power of the State. The State may by legislative action take away from its citizens the most absolute rights of property, and even the very lives of the citizens by *ex post facto* laws, unless forbidden so to do by Federal or State constitutional provision. As aforesaid, the power conferred by section 124 of the Virginia Constitution may be exercised by the *ex parte* action of the municipalities, consisting of the imposition of conditions upon the consent aforesaid. And since there is no constitutional provision safeguarding rights acquired under such *ex parte* action, such rights may be taken away at any time by the State in the exercise of the police power.

But Article 1, section 10, of the Federal Constitution provides as follows: "No State shall  *  *  *  pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts  *  *." That provision renders inviolable contracts entered into by municipalities under authority expressly conferred upon them by the legislature to contract.

Now as to what language in the statute will expressly confer upon municipalities the power to contract on the subject of fixing rates, so as to bring their contracts within the operation of the section of the Federal Constitution just cited, this may he here said:  Any language of a statute which confers upon municipalities the power to fix rates by "agreement" with the grantee to whom, or to which, municipal privileges are granted, is held by the Supreme Court to expressly confer the power in question.

In *Detroit* v. *Detroit, etc., Ry. Co.*, 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; *Detroit, etc., Ry. Co.* v. *Michigan*, 242 U. S. 238, 37 Sup. Ct. 87, 61 L. Ed. 268; and *Detroit, etc., Ry. Co.* v. *Detroit*, 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. 341, contracts entered into by the municipality were held to fall within the operation of the guaranty of the Federal Constitution just mentioned, where the municipal authority conferred by the Michigan statute (Pub. Acts 1867, No. 35, §20) provided that railway rates "shall be established *by agreement* between such company and the corporate authorities of the city or village." (Italics supplied.)

The same was held in *Cleveland* v. *Cleveland City R. Co.*, 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; *Same* v. *Same*, 201 U. S. 529, 26 Sup. Ct. 513, 50 L. Ed. 854; and *Columbus Ry., Power & Light Co.* v. *Columbus*, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648, where the Ohio statute provided that no street

railway franchise shall be granted "except to the corporation, individual or individuals that will *agree* to carry passengers  *  *  *  at the lowest rate of fare." (Italics supplied.)

The same was held in *Los Angeles* v. *Los Angeles City Water Co.*, 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886, of a contract which had been entered into by the city with the water company which was named in a statute which provided that "The following acts, *contracts* and ordinances of the mayor and common council of the city of Los Angeles are hereby ratified and confirmed." (Italics supplied.)

Whereas, if the language of the statute confers upon the municipality merely the power to fix rates by *ex parte* action on its part, it is held by the Supreme Court that such language does not confer the power *to contract* on that subject.  Various reasons are announced for such holding in the different cases, but the *ex parte* character of the power—the absence of the authority to fix the rates by agreement—distinguishes all of such cases.  For example, *Home Tel., etc., Co.* v. *Los Angeles*, 211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed. 176, where the statutory authority was contained in the charter of the city by which the authority conferred upon the city was "to fix and determine the charges for telephones and telephone services; *Milwaukee, etc., Ry. Co.* v. *Railroad Commission*, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254, where the statutory authority (a Wisconsin statute) provided that the municipality might" grant to street railways the use of its streets "upon such terms as the proper authorities shall determine." Mr. Justice Day, in the opinion of the court delivered by him, saying of the statute: "It authorizes the grant of the use of the streets *upon such terms as the proper authorities shall determine*, not upon such *as the parties in interest shall*

*agree;" Wyandotte, etc., Gas Co.* v. *Kansas,* 231 U. S. 622, 34 Sup. Ct. 226, 58 L. Ed. 404, where the Kansas statute authorized cities "to prescribe and fix maximum rates and charges and regulate the collection of the same;" *Pawhuska* v. *Pawhuska Oil & Gas Co.,* 250 U. S. 394, 39 Sup. Ct. 526, 63 L. Ed. 1054, where the Oklahoma statute provided that all grants by municipalities of franchises, such as that in question, "shall be subject at all times to reasonable regulation by ordinance as to use of streets and prices to be paid for gas or light," and the State, by a later statute, transferred the regulatory authority to the State Corporation Commission. The Supreme Court in its opinion having this to say: "Thus the whole controversy is as to which of two existing agencies or arms of the State government is authorized for the time being to exercise in the public interest a particular power, obviously governmental, subject to which the franchise confessedly was granted. In this no question under the contract clause of the Constitution of the United States is involved;" *Worcester* v. *Worcester, etc., Ry. Co.,* 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591, where the Massachusetts statute provided merely that the board of aldermen or selectmen might grant to street railway companies permission to locate the tracks of the railway company in the streets of the city or town, "under such restrictions as they deem the interests of the public may require;" *New Orleans* v. *New Orleans Water Works Co.,* 142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943, where the contract relied on was directly between the State and the water company, and was embodied in the charter of the latter, consisting of a provision that the property of the company should be exempt from taxation and that in consideration thereof the city should be allowed to use all water for municipal purposes free of charge—the Supreme Court approving

11

the decision of the State court that such a contract, in its attempted tax exemption feature was *ultra vires* on the part of the legislature because of State constitutional provisions and therefore void, and holding that therefore no Federal question was involved; and in what the Supreme Court says in reference to the power of the State legislature to alter the provisions of such a contract, reference is made to the power of the legislature to enact, not retroactive, but prospective legislation, to operate upon the relations of the company and the city for the time following the enactment.

The above mentioned decisions embrace all of the Supreme Court cases cited and relied on in argument of counsel as *amicus curiae* and of counsel for the defendant in error; and the statute law of Virginia on the subject, especially when it is read in the light of the Virginia constitutional provisions aforesaid—and independently of those provisions—more clearly and expressly confers upon municipalities the power to fix rates by agreement, i. e., by contract, than any of the statutes involved in the Supreme Court cases cited above which hold that such power was conferred by the statutes therein construed.

When we read section 125 of the Constitution of Virginia, it clearly appears that that section contemplates that the legislature may authorize something more than the exercise by the municipality of the power to impose conditions or restrictions upon the consent aforesaid by *ex parte* municipal action. In addition to the provision specifically mentioned in the *Virginia Western Power Co. Cases*, the following will be here referred to: Other than *ex parte* methods of municipal action on the subject are expressly mentioned, namely, it is specifically provided that "before granting any such franchise * * for a term of years, except for a trunk railway,

the municipality shall first  *  *  *  *receive bids therefor* publicly, in such manner *as may be provided by law*, and shall *then act as may be required by law*."    (Italics supplied.)    The statute, which provided the "law" mentioned, applicable alike in the instant case and in the *Virginia Western Power Co. Cases* (sections 1033e and 1033f of Pollard's Code, 1904), unmistakably *requires* the method by which the municipality is authorized to act in the premises to be by contract, where the consent to the use of the streets, etc., is "for a term of years;" which contract is made by the "bid" or offer made by the grantee of the franchise and the acceptance by the municipality of the "bid" or offer, all as provided for in the statute; thus creating, so far as the terms of the "bid" and acceptance extend, *contract* obligations on the part of the respective parties.    And, as set forth in the opinion in the *Virginia Western Power Co. Cases:* "So expressly are they (the municipalities) authorized to make unlimited contracts, and so binding are the contracts as such, that the courts mentioned in section 1033f are given jurisdiction by mandámus 'to enforce compliance *by said cities and towns* and *by all grantees of franchises  *  *  *  * with all the terms and *contracts* and *obligations of either party*, as contained in franchises.' "

Moreover, as added in that opinion: "The latter section of the statute (section 1033f) further recognizes the binding nature of the franchise contract aforesaid, especially as to rates, during the whole franchise period, unless, of course, it is modified by the consent of both parties thereto—of the municipality as well as the grantee or holder of the franchise; but puts a restriction even upon the exercise on the part of the municipality of its consent to a modification of the terms of the contract by making the provision quoted in the statement preceding

this opinion, to the effect that no such consent as may result in allowing 'an increase in the charge to be made * * * for the use by the public of the benefits of such franchise' shall be given until after certain public advertisement is made."

We therefore find in the statute law of Virginia aforesaid the unlimited power to contract within the meaning of the Federal Constitution; so that a contract fixing rates made by the municipality, in the exercise of that power, falls within the guaranty of Article 1, section 10, of the Federal Constitution, which prevents the impairment of the obligation of contracts by any action of the State, even though it be attempted by the legislature of the State, and that attempt be made in the alleged exercise of the police power. The police power is, in truth, in such case, suspended *pro tanto*, during the life of the contract, by virtue of the provisions of the Federal Constitution aforesaid, which is the supreme law of the land.

Such being the case, even if it were true (which, as pointed out in the *Virginia Western Power Co. Cases*, is not believed to be true), that the Constitution of the State undertook to say that by permission given the legislature to confer upon municipalities the aforesaid power *to contract as to rates* it did not mean to allow the legislature to authorize contracts, the result of which would be to abridge the police power of the State temporarily, that would be immaterial. The sole material question is, has the statute law, enacted with the permission of, and hence not forbidden by, the State Constitution, conferred upon municipalities the unlimited power *to contract as to rates* by franchises, for the franchise period? If so, the Federal constitutional provision aforesaid has ordained the result which must inevitably follow, namely, that the contract, when once made in accordance with the power, shall remain inviolable during its

life. That the statute law of Virginia in question has, with the permission of the State Constitution, given such municipal power to contract is plain, as I think, for the reason stated in the *Virginia Western Power Co. Cases* and above elaborated to some extent.

The chief force of the able argument of counsel for the Virginia Railway and Power Company as *amicus curiae*, in opposition to the views above expressed, consists in its practically ignoring all consideration of the statute law involved and in considering the subject as if section 125 stood alone. When that section and the statute law are read and considered together, the conclusion reached in the *Virginia Western Power Co. Cases* stands unaffected by the opposing argument.

There is one position taken in the argument opposed to the conclusion aforesaid which should perhaps be specifically dealt with, and that is this: Section 125 aforesaid, after providing that the grant of the right to use any public property mentioned, etc., for a term of years shall be made "as may be required by law" (which, as aforesaid, when the franchises involved in those cases and in the instant case were granted, provided for a franchise contract as the sole method to be pursued in such cases), and after making provisions with respect to the taking over by the municipality of the plant and property, if any, of the grantee, contains the following provisions: "*Every such grant * * * shall make adequate provision by way of forfeiture of the grant or otherwise, to secure efficiency of public service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant.*" (Italics supplied). The statute, section 1033-e, aforesaid contains the same language. It is contended that the language which I have italicized is mandatory and contains conditions precedent to the validity of the fran-

chise *as a contract*, and evidences the intention on the part of the State to reserve its right to exercise the power of regulation in the premises in the event that the franchise fails to make the adequate provisions required. But it is apparent from the language itself that it is not susceptible of that construction. By its very terms it is directory only. It specifically directs how the result mentioned (namely, the securing efficiency of public service at reasonable rates and the maintenance of the property in good order throughout the terms of the grant), is to be attained, to-wit, by the contract method. It provides that in the cases in which the municipality undertakes to exercise the power to fix rates by contract, the result aforesaid is to be attained by having "every such grant" (which as aforesaid, as applicable to the instant case, is the same as saying, by having "every such contract") "make adequate provision by way of forfeiture of the grant" (*i. e.*, contract) "or otherwise." It thus relies alone upon the provisions of the *contract* to do this, and so does the statute (section 1033-f aforesaid). The statute, as aforesaid, expressly confers upon the municipalities the power of contract as the method relied on to attain the aforesaid result. That being so, the Federal constitutional provision aforesaid becomes operative and the contract entered into in pursuance of such power becomes inviolable.

If what is said above be not the proper construction of the language of section 125 in question, and if such language were to be construed to be mandatory and to contain conditions precedent to the validity of the franchise *as a contract*, it seems inevitable that the conditions precedent would go to the validity of the entire franchise. In that case the franchise would be void *in toto* if it did not in fact accomplish the result aforesaid.

*A fortiori* the franchise would be void if it did not *attempt* to accomplish such result. That is to say, no municipality could grant a valid franchise unless it undertook to thereby fix rates. This would be a *reductio ad absurdum*, for no one contends that the municipalities, under the aforesaid constitutional and statutory provisions, did not have the power to grant valid franchises which make no attempt to fix rates.

The argument of counsel for the defendant in error, which is also an able one, admits the soundness of the aforesaid conclusions as applied to cases in which the utility corporation has not consented to a change of rates; but urges that, although the municipality may refuse its consent to a change of rates, if the utility corporation consents, the legislature may act for the municipality and consent to such a modification of the contract, notwithstanding the objection on the part of the municipality, and notwithstanding the provisions aforesaid of the statute (section 1033-f), providing the sole method by which a modification of the contract may be made by the consent of the municipality. The advantage to the utility corporations of such a rule is obvious; but the disadvantages to the municipalities is equally obvious. There is a homely adage which says, "it is a poor rule that does not work both ways." If a municipality should find that, under changed conditions, the franchise rate is too high, it could, under such a rule, obtain relief only with the consent of the utility corporation; whereas, the latter, if it should, under the same circumstances, find that the rate is too low, could obtain relief, without the consent and against the protest of the municipality.

Aside, however, from the unfairness of such a rule, which is in itself a strong argument to show the nonexistence of it, on principle and from a legal standpoint,

the legislature has no power, without the consent of the municipality, to change such a contract after it has been made by the municipality. This subject was expressly dealt with in the *Virginia Western Power Co. Case*, and no reason is perceived for reaching a different conclusion from that there reached, namely, that the power to contract having been given to the municipality, and that power, while it remained unrevoked, having been exercised in the making of the contract, the contract is embraced within the guaranty of the Federal Constitution aforesaid—is inviolable by any subsequent State action; so that, while the legislature may revoke the municipal power as to the making of any such future contracts, the contracts theretofore made in execution of the power remain unaffected by the subsequent action of the legislature. That is to say, the case is the same in principle, and the result must be the same, as where power is given to any agent to execute a contract for his principal. When the agent has entered into a contract in execution of the power, the principal is bound by the contract and cannot affect its obligation by afterwards revoking the power of the agent. In *Central Union Tel. Co. Case*, 189 Ind. 210, 126 N. E. 628, relied on for the defendant in error, this principle is recognized. See quotation from that case below.

And a further principle is also involved: In contracts of the character under consideration, the municipality does not act in entering into them merely as an agent of the State; but also in its *quasi* private capacity, as agent for the private advantage of the inhabitants of the municipality itself, as a legal personality distinct from the State. The inhabitants, and the municipality in its private, proprietary capacity, acquire a fixed interest in the observance of the obligation of franchise contracts, made by the municipality in the exercise of

the power conferred upon it as aforesaid, which is protected by the guaranty of the Federal Constitution aforesaid, so that it cannot be taken away without their consent, any more than can the interest of the franchise grantee in the observance of the obligation of such contracts be taken away without such grantee's consent. All of this is pointed out in the *Virginia Western Power Co. Cases.*

In the case of *Winfield* v. *Public Service Com.*, 187 Ind. 53, 118 N. E. 535, P. U. R. 1918-B, 747, cited and quoted from in Judge Prentis' opinion, the original franchise involved was granted to the telephone company in 1901 by the city of Logansport under the statute enacted in 1867 (Acts 1867, p. 33) and amended in 1891 (Acts of Ind. 1891, p. 122, sec. 3623, Burns' 1894). This statute provided that the common council of municipalities should have "exclusive power over the streets, highways, alleys and bridges" within the city for certain named general purposes. The statute vested in the municipalities the power of *ex parte* action merely, not the power *to contract* as to rates. It contained, in substance, merely the same character of provisions as are contained in section 124 of the Constitution of Virginia and in the statute enacted in pursuance thereof. And the Indiana Supreme Court holds in such case that such statute did not confer upon municipalities the power *to contract* as to rates, so as to bring the case within the operation of the contract clause of the Federal Constitution, on precisely the same ground and upon the holding of precisely the same line of authorities as are set forth and cited in the opinion of this court in the *Virginia Western Power Co. Cases.* Moreover, the Indiana court expressly recognizes the doctrine that the State may irrevocably, during the life of the franchise, divest itself of the right to exercise the

police power in the regulation of the rates charged by public service companies and that the State has .divested itself of such right in the case of franchises granted by municipalities under the power *to contract on the subject* expressly conferred upon them by statute.

The subsequent statutes of Indiana, referred to in the quotations from the opinion of the court in the *Winfield Case* made in the majority opinion were material only to this extent: The Public Service Commission of the State was created by act of Assembly in 1913 (Acts 1913, c. 76). The telephone company thereupon surrendered its original franchise and obtained from the city of Logansport a new franchise under the statute law then in force on the subject of the power of municipalities to grant franchises. The statute law, which was in existence at the time the new franchise was granted, vested in the Public Service Commission the power to determine the reasonableness of any and all provisions of franchises, and to regulate the charges of the public service companies. It was under such a condition of the statute law that the provisions of certain sections of the new statute, concerning what the franchises might provide, were held not to confer upon municipalities the power *to contract on the subject,* within the meaning of the Federal contract clause aforesaid. Moreover, the new franchise itself, as is noted in the opinion in that case, contained the following express provision: "This franchise is made and granted, and shall be enjoyed, subject to all the laws passed, or which may hereafter be passed, by the legislature of the State of Indiana for the regulation and control of telephone companies."

In the case of *Salt Lake City* v. *Utah Light & Traction Co.,* 52 Utah 210, 173 Pac. 536, 3 A. L. R. 715, P. U. R. 1918-F, 377, from the opinion in which the quotation is

made in the majority opinion, the sole municipal au-
thority which was relied on by the city as conferring the
power *to contract*, within the meaning of the Federal
Constitution contract clause, was contained in the fol-
lowing provision of the Constitution of Utah (Article 12,
sec. 8), namely: "No law shall be passed granting the
right to construct and operate a street railroad  *   *
within any city or incorporated town, without the con-
sent of the local authorities who have control of the
street or highway proposed to be occupied for such pur-
poses." That provision is, in substance, the same as
section 124 of the Virginia Constitution and the statute
enacted in pursuance thereof, and the Utah Supreme
Court, in the *Utah Light & Traction Co. Case*, held that
it did not confer upon municipalities the power to con-
tract on the subject within the meaning of the contract
clause of the Federal Constitution, for the same reason
and upon the same line of authorities referred to as sup-
porting such holding in the *Virginia Western Power Co.
Cases.* Further, at the time the franchise was granted,
which was involved in the *Utah Light & Traction Co.
Case*, the Constitution of that State also contained the
following provisions, namely: Laws 1917, C. 47, Art. 4,
secs. 1 and 3, vested the Public Utility Commission of
the State with full regulatory powers over any and all
public utility companies and rates charged by them un-
der their franchises or otherwise. Const. Art. 12, sec.
12, provided that "All railroad and other transporta-
tion companies are declared to be common carriers and
subject to legislative control." And Art. 12, sec. 15,
provided that "The legislature shall pass laws estab-
lishing reasonable maximum rates of charges for the
transportation of passengers and freight, for correcting
abuses, and preventing discrimination and extortion in
rates of freight and passenger tariffs by the different

railroads and other common carriers in the State, and shall enforce such laws by adequate penalties." It was of a franchise granted by a municipality, with no greater powers to start with than are conferred by section 124 of the Virginia Constitution, and with those powers further restricted by virtue of the aforesaid other constitutional provisions, that the Utah Supreme Court used the language which is quoted in the majority opinion.

The *Utah Light and Traction Co. Case* holds that, although without power conferred upon it to contract within the meaning of the Federal Constitution contract clause, municipalities may enter into contracts which will be binding both upon the municipality and the person or corporation with which the contracts are made, until and unless the State exercises the police power of regulation. That is to say, that they may make contracts subject to the police power of regulation. And all of the cases referred to in the briefs of counsel for appellee and in the majority opinion, to the effect that as municipalities are merely agents of the State, the State may, at any time, waive the rights of the municipalities "in the contract" (with the single exception of the case of *Grossbeck* v. *Detroit, etc., Co.*, 210 Mich. 227, 177 N. W. 726, 1023, referred to more specifically below), involve *contracts* such as that involved in the *Utah Light & Traction Co. Case*, which are, in truth, not contracts at all within the terms of the Federal Constitution aforesaid.

Such are the following cases cited and relied on by counsel for appellee in his brief (some of which are cited as pertinent cases in the majority opinion), namely: *Pawhuska* v. *Pawhuska Oil & Gas Co., supra* (250 U. S. 394, 39 Sup. Ct. 526, 63 L. Ed. 1054); *Salem* v. *Salem Water, Light & Power Co.*, 255 Fed. 295, 106 C. C. A.

465; *Dubuque Electric Co.* v. *City of Dubuque*, 260 Fed. 353, 171 C. C. A. 219, 10 A. L. R. 495; *Sand Point Water & Light Co.* v. *City of Sand Point*, 31 Idaho, 498, 173 Pac. 972, L. R. A. 1918-F, 1106, P. U. R. 1918-F, 737; *People, etc., Glens Falls* v. *New York Pub. Ser. Com.*, 225 N. Y. 216, 121 N. E. 777; *North Wildwood* v. *Pub. Utility Com.*, 88 N. J. Law, 81, 95 Atl. 749; *Collingswood Sewerage Co.* v. *Collingswood*, 91 N. J. Law, 20, 102 Atl. 901, P. U. R. 1918-C, 261; *In re Northampton E. & W. Traction Co.* (N. J. Sup.), 102 Atl. 930; *Hillsboro* v. *Pub. Ser. Com.*, 97 Ore. 320, 187 Pac. 617, 192 Pac. 390; *Woodburn* v. *Public Ser. Com.*, 82 Ore. 114, 161 Pac. 391, L. R. A. 1917-C, 98, Ann. Cas. 1917-E, 996; *In re Searsport Water Co.*, 118 Me. 382, 108 Atl. 452; *In re Island Falls Water Co.*, 118 Me. 397, 108 Atl. 459; *State, etc.,* v. *Burr*, 79 Fla. 290, 84 So. 61; *City of Sapulpa* v. *Oklahoma Natural Gas Co.*, 79 Okl. 196, 192 Pac. 224; *City of Portland* v. *Pub. Ser. Com.*, 89 Ore. 325, 173 Pac. 1178; *Village of Warsaw* v. *Pavilion Natural Gas Co.*, and *Village of Perry* v. *Same*, 111 Misc. Rep. 565, 182 N. Y. Supp. 73; *New Orleans* v. *New Orleans Water Works Co.*, *supra* (142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943); *Worcester* v. *Street Ry. Co.*, *supra* (196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591); *Traverse City* v. *Michigan R. Com.*, 202 Mich. 575, 168 N. W. 481, P. U. R. 1918-F, 752; *Leiper* v. *Balt. & P. R. Co.*, 262 Pa. 328, 105 Atl. 551, P. U. R. 1919-C, 397; *Central Union Tel. Co.* v. *Indianapolis Tel. Co.*, 189 Ind. 210, 126 N. E. 628. *Southern Iowa Electric Co.* v. *Chariton*, 255 U. S. 539, 41 Sup. Ct. 400, 65 L. Ed. 764 (May 15, 1921), cited in the brief of counsel for the Virginia Railway and Power Co., is also one of the same class of cases.

In *Pawhuska* v. *Pawhuska,* as above noted, the Oklahoma statute relied on to confer the municipal authority, authorized merely the *ex parte* action of the city,

consisting of reasonable regulation at all times by ordinance.

In *Salem* v. *Salem Water Co.*, *supra*, cited in the majority opinion, the act of incorporation of the city, relied on to confer the municipal authority, provided that the common council of the city "may grant and allow the use of the streets and alleys of the city to any person, company or corporation who may desire to establish water works for supplying the city and the inhabitants thereof with  *  *  *  water or light *upon such terms and conditions as the council may prescribe.*" (Italics supplied.)   This is merely the *ex parte* authority above mentioned, and not the authority *to contract* within the meaning of the Federal Constitution clause aforesaid.

In *Dubuque Electric Co.* v. *City of Dubuque* (an Iowa case) and *Sand Point Water & Light Co.* v. *City of Sand Point* (an Idaho case), there was no statutory or constitutional authority whatever purporting to empower the city to contract as to rates.

In *People, etc., Glens Falls* v. *Pub. Ser. Com.* (a New York case) the statutory authority relied on by the city provided that gas companies might "lay conductors for conducting gas through the streets  *  *  * in each such city, village and town, with the consent of the municipal authority thereof, and under such reasonable regulations as they may provide."

In *North Wildwood* v. *Pub. Utilities Com.* (a New Jersey case involving water rates) there was no statutory or constitutional authority whatever purporting to empower the city to contract as to rates.

In *Collingswood Sewerage Co.* v. *Collingswood* (also a New Jersey case, involving sewerage rates) the statute relied on by the city (Acts 1898, p. 484), incorporating the city, merely authorized it to give or refuse its con-

sent to the use of its streets, etc., and to fix the rates to be charged by the grantee of the franchise as a condition attached to that consent.

In the case of *In re Northampton E. & W. Traction Co.* (likewise a New Jersey case) the report of it does not disclose the statute involved, but refers to the *Collingswood Case*, just cited, for reasons on which the decision is based.

In *Hillsboro* v. *Pub. Ser. Com.* (an Oregon case) the provision in the charter of the city did authorize the city council "to contract with any person, persons or corporation" *for water,* but it did not authorize thè fixing of the rates to be charged therefor by contract or agreement. The statute also contained the language that the city council was authorized *"to make provisions* for providing the city with water," etc. And the court held that the municipal authority thus conferred was not contractual in its nature, but was precisely of the same character as that involved in *Woodburn* v. *Pub. Ser. Com., supra,* next to be mentioned below.

In *Woodburn* v. *Pub. Ser. Com.* (also an Oregon case) the statute relied on to confer the municipal authority was contained in the amended charter of the city, and provided merely that the city was given the power "to grant franchises in, through and upon the streets of the city for public uses and public benefit."

In the case of *In re Searsport Water Co.* (a Maine case) the decision is placed upon the ground that "the fixing or regulation of charges to the inhabitants of the city, by contract, is nowhere mentioned" in the provisions of the charter of the city, or company, which were relied on to confer the municipal authority to fix such charges by contract within the meaning of the contract clause of the Federal Constitution. The case is on all fours with *Hillsboro* v. *Pub. Ser. Com., supra.*

In the case of *In re Island Falls Water Co.* (also a Maine case) the language of the statute is not given in the report of the case. This, however, is said of it: "More distinct language than that of the statute (P. & S. L. 19.05, c. 22) invoked as sustaining the contract relied upon, must be used before a public service is withdrawn from the regulatory power of the State."

In *State, etc.* v. *Burr* (a Florida street railroad rate case) the municipal authority relied on was contained in the charter of the city. By the original charter the city was given "power by ordinances * * to grant the right of way through the streets, avenues and squares of said city for the purposes of street or other railroads." The charter was amended by a subsequent act. The report of the case does not give the language of the amendment, but of the provisions says this: "The provisions * * * amending the charter of the city of Jacksonville do not confer upon the city authority to fix rates of fares for street railroads, although it does confer power with reference to the use of the streets and viaducts by street railroads."

In *City of Sapulpa* v. *Oklahoma Natural Gas Co.* (an Oklahoma case) the statute provided as follows: "Sec. 754. They (the city council) shall have the power to provide for lighting the streets and alleys of the city by gas or otherwise and to authorize the construction of gas works and street railroads. Sec. 755. For the purpose of providing water, gas and street railroads, the mayor and city council may contract with any person or company *to construct and operate the same,* and may grant to such company or person *for a time which may be agreed upon* the exclusive privilege of using the streets and alleys of such city for such purpose or purposes." (Italics supplied.) The court in its opinion says this: "We are * * of the opinion that * * sections 754 and

755 * * did not clearly confer upon the city of Sa-pulpa power *to fix the rates* for a definite period of time * * ." (Italics supplied).

In *City of Portland* v. *Pub. Ser. Com.* (an Oregon case) the statute provided as follows: "The council may * * * grant for a limited time specific franchises or rights in or to any of the public property or places men-tioned in the preceding sections. Every such grant shall specifically set forth and define the nature, ex-tent and duration of the franchise or right thereby granted, and no franchise or right shall pass by impli-cation. At all times the power and right reasonably to regulate in the public interest the exercise of the fran-chise or right so granted shall remain and be vested in the council, and said power and right cannot be di-vested or granted." This is practically the same situa-tion of the statute law as that involved in the *Pawhuska Case, supra.*

In *Village of Warsaw* v. *Pavilion Natural Gas Co.* and *Village of Perry* v. *Same* the statute law was the same as that involved in *People, etc., Glens Falls* v. *Pub. Ser. Com., supra.*

In *New Orleans* v. *New Orleans Water Works Co.* and *Worcester* v. *Street Ry. Co.* the statutes involved have been above cited in the references made to those cases.

In *Traverse City* v. *Michigan R. Com.* it was not even claimed that, as the laws of Michigan then stood, there was any express statutory authority given the city to fix rates to be charged by telephone companies by con-tract; and it is held in this case that such authority is not to be inferred from the power conferred upon the city "to regulate and control the use of its streets by telegraph and telephone or other companies" referred to in such grant of power.

In *Leiper* v. *Balt. & P. R. Co.* (a Pennsylvania case)

12

the rate contract was made between an individual and the railroad company and there was no legislative authority conferring upon the individual, or the railroad company, the power to make such a contract. Indeed, at the time the contract was made, the laws of Pennsylvania, by its Constitution and statutes, expressly reserved to the State the power of regulation over all rates charged by public service companies, which power was at one time exercised through the courts under statute passed long before the individual contract involved in the case before the court was made, and, later, by the Public Service Commission, to which such regulatory power was transferred by a statute passed after such individual contract was made.

In *Southern Iowa Electric Co.* v. *Chariton*, 255 U. S. 539, 41 Sup. Ct. 400, 65 L. Ed. 764, May 15, 1921, the statute relied on to confer the municipal authority provided that the municipalities "* * shall have power to require every individual or private corporation operating such works or plant, subject to reasonable rules and regulations, to furnish any person applying therefor along the line of its pipes, mains, wires, or other conduits, with gas, water, light, or power, and to supply said city or town with water for fire protection, and with gas, water, light or power for other necessary public purposes (and to regulate and fix the rent or rates for water, gas, heat and electric light or power), * * and these powers shall not be abridged by ordinance, resolution or contract."

In *Central Union Tel. Co.* v. *Indianapolis Tel. Co.*, the municipal authority to fix rates by franchise contract is not involved, although it is discussed and the distinction is recognized which, as aforesaid, is made in the Supreme Court cases above mentioned, between municipal authority to act *ex parte* and the authority

to fix rates by agreement. In this case the franchise in question contained a clause in which it was stated that "It is also agreed that the franchise and privileges herein granted by the city of Indianapolis are so granted upon the distinct *condition* that * *" (the franchise and rights thereunder should not be thereafter assigned) "without the consent of the Board of Public Works of said city and ratified by the common council of the city * *." Subsequently a statute was enacted to the effect that such franchises and rights thereunder might be sold and assigned with the consent of the Public Service Commission; and thereafter the franchise was sold and assigned with the consent of such commission thereupon obtained. The sole question in the case was, whether the aforesaid clause in the franchise vested in the city a contract right of giving or withholding its consent to such sale and assignment, which could not be taken away by the State by the subsequent legislation conferring the function of the exercise of such right of consent upon another agency of the state, to-wit, the Public Service Commission.

The court held, in substance, that although acquired by contract, the right in question was in truth merely a right to exercise a power which was, in its nature, a condition imposed upon the right of the grantee of the franchise to sell it, which was to be exercised by *ex parte* action of the city in its public character of mere agent of the State. That, therefore, the State had the right, before such power was exercised, to designate some other agency to exercise it, to-wit, the Public Service Commission. And on this subject the court in its opinion says this: "If, before the power to give or to withhold such consent was withdrawn by the State, the city had exercised the power by assenting to a sale, such assent would have bound the State, and any contract of

sale made thereunder would have been protected by the Constitution" (meaning the contract clause of the Federal Constitution) "from the imposition by the State of any additional terms or conditions or from any changes or alterations in its terms. The State, however, might withdraw the power to give or to withhold consent to such sale at any time before it was finally exercised by the city. By section 95½ of the public utilities act, *supra,* the power to give or to withhold consent to such sales was withdrawn by the legislature from all of the municipalities of the State, and that power was delegated to the Public Service Commission. After the taking effect of that act, the sole power to give or to withhold such consent rested in the commission, and municipalities were entirely shorn of such power."

We see, therefore, that in all of these cases which are relied on as opposed to the holding in the *Virginia Western Power Co. Cases,* with the single exception of the case of *Groesbeck* v. *Detroit, etc., R. Co.* (which will be presently more explicitly mentioned), the express authority, if any, conferred upon the municipalities is either an authority regulatory in its nature or is an authority to act merely *ex parte,* by imposing conditions or restrictions upon the consent or permission granted, neither of which is an authority contractual in its nature, but is merely the same character of authority as is conferred by section 124 of the Virginia Constitution and the statute enacted in pursuance thereof, and no more; and is not the aforesaid power to fix the rates *by agreement* between the municipality and the grantee of the franchise, which, as aforesaid, is, when expressly authorized by the State, the power *to contract* which is embraced within the meaning of the contract clause of the Federal Constitution. In most of these cases this distinction is expressly alluded to; in some it is not; but

in all it exists, and entirely harmonizes the holding of these cases with the Supreme Court cases above cited on the subject of when municipal contracts fall within the guarantee of the Federal Constitution contract clause. So that, in truth, these cases leave, as the real question to be determined, that which was decided in the *Virginia Western Power Co. Cases*, namely:   Did the statute law of Virginia aforesaid expressly confer upon the municipality the authority to fix the rates in question by franchise agreement?   The whole case, in so far as the construction of the statute law is concerned, depends and turns upon the decision of that question.

The case of *Groesbeck* v. *Detroit, etc., R. Co., supra* (210 Mich. 227, 177 N. W. 726 1023), was decided by a divided court, two judges dissenting.   The majority opinion does hold that the legislative right existed to empower the Public Service Commission to regulate the rates fixed by a franchise contract made by the city under the authority expressly conferred by the Michigan statute, which provided that railway rates ''shall be established *by agreement*'' between the railway company and the corporate authorities of the city.   But the holding is in direct conflict with the Supreme Court case of *Detroit, etc., Ry. Co.* v. *Michigan, supra* (242 U. S. 238, 37 Sup. Ct. 87, 61 L. Ed. 268), in which the very same Michigan statute was involved, as well as with the other Supreme Court cases of *Detroit* v. *Detroit, etc., Ry. Co., Cleveland* v. *Cleveland City R. Co., Same* v. *Same, Columbus Ry. Power & Co.* v. *Columbus*, and *Los Angeles* v. *Los Angeles City Water Co.*, above cited; as is pointed out in the dissenting opinion delivered by Judge Fellows and concurred in by Judge Bird.   Moreover, the reasoning of the dissenting opinion is convincing, whereas the majority opinion contains a mere statement of conclusion unsupported by any reasoning,

merely referrring to certain decisions to sustain the conclusion. Among the cases I have reviewed are all of the cases cited in the majority opinion to sustain its holding, except two, a Supreme Court case and a Missouri case. None of the cases which I have reviewed sustains such holding. The Supreme Court case cited is *Kies* v. *Lowry*, 199 U. S. 233, 26 Sup. Ct. 27, 50 L. Ed. 167. That case holds merely that a contract obligation is not impaired by a statute creating a new school district and giving to it property within its limits which had belonged to the old district out of which the new district was created. Plainly, the case is entirely foreign to the subject of, and does not sustain, the holding under consideration. I do not have the Missouri case before me at the moment.

I have carefully examined the notes in 3 A. L. R. 730-748 and 9 A. L. R. 1165-1177, cited in the majority opinion, and find nothing therein inconsistent with the views above expressed, when what is there said is carefully considered in the light of what is really involved in the cases referred to, except that, in the 3 A. L. R. note at pp. 735-6 there are references to the statements in the opinions in certain cases cited, to the effect that there is a distinction between the power of the municipalities to make rates for themselves and power to make rates for their inhabitants; but it is found, on examination of those cases, either that the decisions do not depend upon such distinction, or that the municipal authority in question in the particular case makes that distinction and confers the power in the one case, but not in the other. *Re Lincoln Water Co.* (Me.), P. U. R. 1919-B, 752, is a case of the latter class. In that case it was held that the general law of Maine did not confer upon municipalities the power to regulate the rates which water companies might charge the

inhabitants; and that such power could not be implied from the power granted in the charter of a municipality, "to contract for water for municipal and fire purposes." As aforesaid, the Virginia statute on the subject expressly confers on municipalities the power to fix *by contract* the *rates* charged the inhabitants of the municipality as well as the rates charged the municipality itself.

The case of *Sedalia* v. *Pub. Ser. Com.*, 275 Mo. 201, 204 S. W. 497; *Leiper* v. *B. & P. R. Co.*, 262 Pa. 328, 105 Atl. 551, P. U. R. 1919-C, 397, cited and relied on by counsel in behalf of defendant in error, is, in its holdings, in a class by itself.

The statute involved in the case just cited, as stated in the report of the case, merely authorized the city to contract *for water service*, in lieu of the city's furnishing itself with water by municipal ownership and operation of the plant. The statute, in truth, was, in substance, merely the same as those involved in the *Hillsboro*, *Searsport*, *Lincoln* and *Sapulpa Cases* above reviewed, by which the authority to contract as to certain matters was conferred upon the municipalities, but the authority to fix rates by the contract was not thereby expressly conferred. The case might have been properly decided, just as it was decided, upon that ground.

.However, considering the decision as it stands, the following will be observed: The court held that the statute involved would have had the effect of conferring upon municipalities the power to contract as to rates, within the meaning of the contract clause of the Federal Constitution, if the legislature had had the power to enact it. The court further held, however, that in view of the provision of section 5 of Article 12 of the Missouri Constitution, the legislature did not have the power to enact such a statute so as to confer

such power *to contract* as to rates. The language of such section of the Missouri Constitution is as follows: "The exercise of the police power of the State shall never be abridged or so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals, or the general well-being of the State." This was the sole provision of that Constitution on the subject. It did not, like the Virginia Constitution, in addition to such provision, contain further provisions, such as are found in section 125 of the Virginia Constitution, which expressly sanction the contemplated enactment by the legislature of a statute conferring upon municipalities the power to contract within the meaning of the Federal Constitution contract clause, until such time as the legislature should enact still further legislation taking away such power from municipalities after the enactment of the latter character of legislation. As pointed out in the opinion of the court in the *Western Power Co. Cases*, it seems plain that, under all of the provisions of the Virginia Constitution on the subject (which must be all read and construed together) the Virginia legislature had the power to enact the statute law in question at the time it was enacted. When all of the clauses of the Virginia Constitution on the subject are read together, they plainly say, in substance, this: The power of the State to regulate rates charged by public utilities shall never be *permanently relinquished*, but may be suspended *pro tanto*, for periods not exceeding thirty years, by contracts fixing such rates, entered into by municipalities under the authority of the statute law which is involved in the instant case, so long as that statute law remains unchanged, the power of the legislature all the time existing, however, by the repeal of such statute law, or by other enactment, to take away at any time from

municipalities the authority to make such contracts after such action of the legislature. Therefore, as such statute law was valid under the Virginia Constitution, it conferred upon municipalities the power to make the contract in question so long as that statute law remained unaltered by the legislature. It so remained when the franchise contract involved in the instant case was entered into, as aforesaid, hence such contract is embraced within the guarantee of the aforesaid clause of the Federal Constitution on the subject, under the rule established by the unbroken line of Supreme Court decisions above cited.

Kelly, P., concurs in this dissent.